order of the Court or upon written consent of the respondent.

The Clerk shall cause a copy of this order to be transmitted to the Chairman of the Board on Professional Responsibility and to the respondent, thereby giving him notice of the provisions of Rule XI, §§ 14 and 16, which set forth certain rights and responsibilities of disbarred attorney and the effect of failure to comply therewith.

In the Matter of Leon A. SWINSON, Esquire

**A Member of the Bar of the District of Columbia, Court of Appeals, Bar Registration No. 469838.**

**No. 08–BG–338.**

District of Columbia Court of Appeals.

May 8, 2008.

BEFORE: GLICKMAN and KRAMER, Associate Judges; and BELSON, Senior Judge.

**ORDER**

PER CURIAM.

On consideration of the affidavit of Leon A. Swinson, wherein he consents to disbarment from the Bar of the District of Columbia pursuant to § 12 of Rule XI of the Rules Governing the Bar of the District of Columbia Court of Appeals, which affidavit has been filed with the Clerk of this Court, the report and recommendation of the Board on Professional Responsibility with respect thereto, it is this 8th day of May, 2008,

ORDERED that the said Leon A. Swinson is hereby disbarred by consent effective thirty (30) days from the date of this order. The effective date of respondent's disbarment should run, for reinstatement purposes, from the date respondent files his affidavit pursuant to D.C. Bar Rule XI, § 14(g).

The Clerk shall publish this order, but the affidavit shall not be publicly disclosed or otherwise made available except upon order of the Court or upon written consent of the respondent.

The Clerk shall cause a copy of this order to be transmitted to the Chairman of the Board on Professional Responsibility and to the respondent, thereby giving him notice of the provisions of Rule XI, §§ 14 and 16, which set forth certain rights and responsibilities of disbarred attorney and the effect of failure to comply therewith.

**CATHEDRAL AVENUE COOPERATIVE, INC., Appellant,**

v.

**Hope H. CARTER, John Hemphill, Jr., and Twenty Fifty–Eight Partnership, L.P., Appellees.**

**No. 07–CV–205.**

District of Columbia Court of Appeals.

Argued April 8, 2008.

Decided May 15, 2008.

As Amended June 16, 2008.

See also 658 A.2d 1047

James H. Hulme, with whom Donald B. Mitchell, Jr. and Joshua A. Fowkes, were on the brief, Washington, for appellant.

Richard T. Rossier, Washington, with whom Susan M. Gschwendtner was on the brief, for appellees.

Before RUIZ and REID, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

This landlord and tenant case brings to this court, for the fourth time, a rent dispute that has continued for a quarter-century between Cathedral Avenue Cooperative, Inc. (the Tenant), a cooperative association that owns the 145–unit residential building at 4101 Cathedral Avenue, N.W., and Hope H. Carter, John Hemphill, Jr., and Twenty Fifty–Eight Partnership, L.P., all members or successors of a group (the Landlord) that in 1959 leased the land to the Tenant for 99 years for construction and operation of the building.

In August 2006, an arbitration panel increased the rent under the ground lease to $163,493.84 for the period 2004–2014. The central question presented on appeal is whether this arbitration award is limited to the dollar amount calculated by the panel, as the Landlord contends, or is broad enough to include the reasons for the decision, as the Tenant maintains. More specifically, the Tenant urges us to

rule that a majority of the arbitrators expressly premised the dollar calculation on an interpretation of the lease that limits any rent increase to an adjustment derived solely from an inflation index. The Landlord, to the contrary, argues that no majority rationale is evident from the arbitrators' opinions, and thus that the scope of the award is limited—as the trial court ruled—to the agreed-upon bottom line, $163,493.84.

The significance of this dispute lies not in the rent level payable during 2004–2014 but in the potential impact of the award on future arbitrations. If the arbitrators expressly calculated the increase based on the Tenant's interpretation of the lease, that will strengthen the Tenant's argument that this interpretation binds future arbitrators under the doctrines of *res judicata* or collateral estoppel. If, however, the rationale for decision is not part of the award, the Landlord will have more room to argue in a future proceeding (as it did unsuccessfully in this one) that the decennial rent adjustment can—and should—be premised on increased land value, not merely on inflation. In that case, the Tenant would be limited to arguing that the inflation index rationale, while not expressly part of the 2006 award, is nonetheless *implicit* in it (and thus that the Landlord's land value argument is precluded forevermore, even though the 2006 award did not expressly incorporate a preclusion rationale).[1]

This is not the first time that the rationale for decision has surfaced as an issue. In two previous arbitration proceedings— the first initiated by the Landlord, the

---

1. We explain the significance of this case only to make clear why the parties, who both accept the new rent level, are nonetheless disputing now the scope of the arbitration award. We express no opinion on whether, or how, our decision might have a bearing on the application of *res judicata* or collateral estoppel in the next rent adjustment proceeding ten years hence. We focus only on the proper understanding of the 2006 arbitration covering the years 2004–2014 and leave to future tribunals all decisions about the impact of our ruling, if any, in subsequent proceedings.

second initiated by both the Landlord and Tenant—the parties sought a ruling that incorporated the rationale for the decision, but for different reasons no definitive answer was forthcoming in either case. In the present proceeding, in contrast with the earlier ones, each arbitrator wrote extensively on the meaning of the rent adjustment clause. In ruling on the Tenant's motion to confirm the award, however, the trial court continued the narrow approach. The judge confirmed the arbitrators' decision that set the annual rent "for the 10-year period commencing November 1, 2004" at $163,493.84. But, without a hearing or an explanation, the judge declined "to specifically adopt or reject any reasoning articulated by the arbitrators."

Although neither party contests the $163,493.84, the Tenant appeals the portion of the trial court order that declined to incorporate the reasons for decision by the two arbitrators in majority. It asks us to find in the majority decision an interpretive ruling that the lease limits a rent adjustment to an increase based on inflation alone. For the reasons that follow, we agree with the Tenant and remand the case with instructions to amend the Confirmation of Arbitration Award, as set forth at the end of this opinion.

## I.

The Landlord and Tenant executed the ground lease (Lease) in November 1959. It provided an initial annual rent of $25,320 subject to increase, for the first time, after twenty-five years. The rent adjustment provision appears in Article I, Section 4, which also anticipates arbitration:

> [S]aid annual basic rental of Twenty-Five Thousand Three Hundred Twenty Dollars ($25,320.00) shall be adjusted to the Wholesale (Primary Market) Price Index, for all items, as determined by the United States Department of Labor, Bureau of Labor Statistics [the WPI],

> ... or its successor or most nearly comparable successor at the time of the adjustment.... If such Index shall be discontinued with no successor or comparable successor, *or if either party with reasonable grounds therefor shall notify the other that such Index is no longer applicable for the purpose of this lease,* the parties shall attempt to agree upon a substitute formula, but in the event the parties are unable to agree upon a substitute formula, then the matter shall be referred to arbitration as herein provided. (Emphasis added.)

The parties refer to the highlighted portion of the rent adjustment provision as the "Opt–Out Clause"—the clause at the heart of this dispute.

The rent adjustment provision also includes strict time periods for seeking a change in the rent level:

> At least (90) days prior to the expiration of the first twenty-five (25) years of the term of this lease and at least ninety (90) days prior to the expiration of each succeeding ten (10) year period of the term hereof, the Landlord or the Tenant may, upon written notice to the other, request that the basic annual rental then being payable hereunder be increased or decreased for the succeeding ten (10) year period of the term of this lease in accordance with the foregoing provisions.

Failure to give timely written notice of a request for a rent adjustment will leave the pending rent level intact for the next ten years.

Article XII of the Lease specifies the procedures governing arbitration. The portions relevant here state: "In case there are three (3) arbitrators selected as above mentioned, *an award in writing signed by any two of them shall be final.* The expense of any such arbitration shall be borne equally by the Landlord and the Tenant. Judgment upon any award here-

under may be entered in any court having jurisdiction thereof." (Emphasis added.) Article XII did not provide for application of any particular rules and said nothing about whether the arbitrators should issue a reasoned award.

*The 1984 Arbitration*

The Landlord sought the first rent adjustment, and initiated the related arbitration, in 1984. It argued that because land values had been accelerating at a rate higher than advances in the Producer Price Index (PPI, successor to the WPI), it had "reasonable grounds" to argue under the Opt–Out Clause that an inflation index was "no longer applicable" and that the rent instead should be premised on land value.

The arbitration proceeding went nowhere. The trial court agreed with the Tenant that the validity of the Landlord's notice seeking a rent increase was not subject to arbitration and ruled on the merits that the notice was untimely. *See Carter v. Cathedral Ave. Coop., Inc.,* 532 A.2d 681, 683 (D.C.1987). Because a motion was pending in the trial court, however, we dismissed the Landlord's appeal as premature. *See id.* at 683–85. Thereafter, the trial court ruled again that the notice issue was not arbitrable, a ruling we reversed. *See Carter v. Cathedral Ave. Coop., Inc.,* 566 A.2d 716, 719 (D.C.1989). Eventually, another judge ruled that the arbitration should proceed before a three-member panel, not before a single arbitrator as the Landlord had argued. We sustained that ruling. *See Carter v. Cathe-*

*dral Ave. Coop., Inc.,* 658 A.2d 1047, 1048 (D.C.1995). In the end, the arbitration panel ruled that the Landlord's request to change the nature of the rent adjustment formula was untimely, and the panel determined that the annual rent for the ten-year period 1984–1994 would be $83,343.84, after applying the PPI index formula in Article I, Section 4 of the Lease.[2]

*The 1994 Arbitration*

In 1994, the Landlord and tenant jointly initiated arbitration in order to settle the issue that the Landlord had failed, on procedural grounds, to have resolved in 1984, namely, whether appreciating land values were "reasonable grounds" under the Opt–Out Clause for abandoning an inflation index as "no longer applicable for the purpose of this lease." The Landlord presented evidence that "[s]ince the beginning of the lease term, the PPI has increased by a factor of 3.76, whereas the value of the land has increased by a factor of 11.8." A three-member arbitration panel, without expressly addressing the Landlord's contention, retained an inflation index—substituting the Consumer Price Index (CPI) for the PPI—and calculated the ten-year annual rent for 1994–2004 at $128,925.31.

*The 2004 Arbitration*

In June 2004, the Landlord again announced that there were "reasonable grounds" for concluding that an inflation index was "no longer applicable" and submitted the matter for arbitration. The Tenant moved for a stay, asking the trial court to rule—based on the 1994 arbitration—that *res judicata* (claim preclusion)[3]

---

2. After finding the Landlord's demand for arbitration untimely, the panel also concluded, 2 to 1, that the Landlord had "proposed a formula that should be adopted as a 'substitute formula' under Article I, Section 4 of the Lease." The Landlord's chosen arbitrator filed a concurrence explaining that the panel's statement meant that the panel had accepted the Landlord's substantive position as applicable to all "future adjustments." The

Tenant's chosen arbitrator filed a dissent contending that the Landlord had "expressly limited" its proposal to the ten-year period 1984–1994. The meaning of the panel's statement was never definitively resolved.

3. *See, e.g., Patton v. Klein,* 746 A.2d 866, 869–70 (D.C.1999) ("a final judgment on the merits of a claim bars relitigation in a subsequent proceeding of the same claim between the

and/or collateral estoppel (issue preclusion)[4] barred the Landlord from rearguing its contention under the Opt–Out Clause that the decennial rent level should be premised on land value, not inflation. The court denied the stay, ruling that the preclusion question itself was for the arbitrators, not the court, to decide.

Each party then appointed an arbitrator, and those two chose a third, neutral member to chair the panel. The Tenant moved to dismiss the Landlord's demand for arbitration on preclusion grounds, whereupon arbitrators Tenenbaum and Von Salzen, on June 9, 2005, denied the motion without prejudice, reserving the right to reconsider upon presentation of additional evidence that the 1994 award (issued in 1995) barred the Landlord's 2004 contention.[5] Arbitrator Moses dissented, concluding, by reference to the 1994 award, that res judicata and collateral estoppel precluded the Landlord from proceeding under its theory.

After the arbitration hearing, a majority of the panel, arbitrators Tenenbaum and Moses, rejected the Landlord's argument and set the annual rent level for the ten years beginning November 1, 2004, at $163,493.84 based on the CPI. Arbitrator

Tenenbaum wrote a 47–page "Arbitration Decision" elaborating his reasoning. Arbitrator Moses—concurring "in the Arbitration Decision by the majority of the Panel"—issued a one-page "Concurring Opinion" stating that, by virtue of the 1994 award, res judicata precluded rejection of the CPI index; otherwise he would have found the PPI "still applicable." Arbitrator Von Salzen dissented. He found support for the Landlord's position in the "objective law of contracts," a meticulous parsing of Article I, Section 4 of the Lease, the economic data supplied by the Landlord's experts, and a refutation of arbitrator Tenenbaum's legal analysis.

The Tenant filed in the trial court a Motion to Confirm Arbitration Award, which the Tenant interpreted to include not only the ten-year annual rental but also the majority rationale for decision limiting rent increases under the Opt–Out Clause to calculations based on an inflation index. The Landlord did not object to confirmation of the ten-year dollar amount but opposed interpreting the Award to include a particular rationale for decision. As noted earlier, the trial judge, without holding a hearing, declined—without explanation—"to specifically adopt or reject

same parties or their privies," as well as claims "arising out of the same transaction which could have been raised" but were not) (citations omitted).

**4.** See, e.g., Washington Med. Ctr. v. Holle, 573 A.2d 1269, 1283 (D.C.1990) (collateral estoppel "renders conclusive in the same or a subsequent action determination of an issue of fact or law when (1) the issue is actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; (4) under circumstances where the determination was essential to the judgment, and not merely dictum") (citations omitted).

**5.** The majority agreed that the 1994 award "specifically reserved the right of both Land-

lord and Tenant ... to establish reasonable grounds at the time of each decennial adjustment .... for asserting that the rent adjustment formula ... is no longer applicable for purposes of the Ground Lease." Nor had the Tenant established that the grounds asserted by the Landlord in 2004 were identical to those sought in 1994 (or that other requirements of res judicata or collateral estoppel had been satisfied). Finally, according to the majority, the Tenant had not proved that the 1994 panel had "decided that the Ground Lease requires the use of an inflation-based approach to the decennial rent adjustment, rather than a value-based index or formula, or a hybrid formula, for making rent adjustments."

any reasoning articulated by the arbitrators."

Before us now is the Tenant's appeal of (1) the trial court's refusal to confirm the arbitrators' legal rationale, in addition to the dollar value of the award, and (2) the court's further refusal to award the Tenant "costs, disbursements, and attorneys' fees" pursuant to the District of Columbia Arbitration Act (DCAA), D.C.Code § 16–4313 (2001). In addition to opposing the Tenant's contentions, the Landlord, citing Article XX of the Lease, asks for its own "costs, expenses, and reasonable attorney fees" attributable to the appeal.

## II.

■■■ "We review *de novo* a trial court's judgment confirming an arbitration award." [6] Judicial review of arbitration awards, however, is limited.[7] "This limited review serves to attain a balance between the need for speedy, inexpensive dispute resolution, on the one hand, and the need to establish justified confidence in arbitration among the public, on the other." [8] In considering arbitration agreements made before enactment of the DCAA in 1977, the trial court must confirm an award unless the arbitrators exceeded "the scope of their authority," [9] or were party to "corruption" or "fraud," or responsible for "gross" or "manifest" mistake of law.[10] For agreements made after enactment of the DCAA,[11] the statute expressly incorporates all but the last of these common law criteria in greater detail, while omitting all reference to legal mistake.[12] Despite that omission, however, this court has acknowledged that "[w]here it appears that the arbitrator manifestly disregarded the law, court inquiry may be undertaken," at least when the decision approaches "being arbitrary and capricious." [13] Aside from this extreme exception, however, this court "will not review an arbitration decision on the merits." [14] This virtual omission of

---

6. *Tauber & Assocs. v. Trammell Crow Real Estate Servs., Inc.*, 738 A.2d 1214, 1216 (D.C. 1999) (citing *Grad v. Wetherholt Galleries*, 660 A.2d 903, 905 (D.C.1995)).

7. *Id.* at 1217 (citing *Shaff v. Skahill*, 617 A.2d 960, 963 (D.C.1992)).

8. *Id.* (citing *Brandon v. Hines*, 439 A.2d 496, 509 (D.C.1981) (internal quotation marks omitted)).

9. *Brandon*, 439 A.2d at 509.

10. *Mancuso v. L. Gillarde Co.*, 61 A.2d 677, 679 (D.C.1948).

11. D.C.Code § 16–4318 (2001); *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 360 (D.C.2005).

12. The DCAA, D.C.Code § 16–4311(a) (2001), provides that a court shall vacate an arbitration award only when:
 (1) The award was procured by corruption, fraud or other undue means;
 (2) There was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;
 (3) The arbitrators exceeded their powers;
 (4) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of section 16–4315, as to prejudice substantially the rights of a party; or
 (5) There was no arbitration agreement and the issue was not adversely determined in proceedings under section 16–4312 and the party did not participate in the arbitration hearing without raising the objection; but the fact that the relief was such that it could not or would not be granted by a Court of law or equity is not ground for vacating or refusing to confirm the award.

13. *Lopata v. Coyne*, 735 A.2d 931, 940 (D.C. 1999); *accord Shore v. Groom Law Group*, 877 A.2d 86, 91 (D.C.2005).

14. *Lopata*, 735 A.2d at 940 (quoting *Poire v. Kaplan*, 491 A.2d 529, 534 (D.C.1985) (internal quotation marks omitted)).

review for legal mistake, both at common law and under the DCAA reflects a policy—inherent in election of arbitration over a judicial trial—that the parties have bargained for the arbitrators' judgment, even more than for legal correctness, and thus should not be deprived of that judgment.[15]

For our purposes, because the Lease was signed years before enactment of the DCAA and has not been amended thereafter, the DCAA would have no relevance except for the Tenant's request for attorney fees and costs pursuant to the statute—the last issue for our consideration.

## III.

In order to demonstrate that the arbitration award includes a legal ruling, not just a dollar amount, the Tenant argues in its brief that the award embraces the "Arbitration Decision" in full—in other words, the reasons for decision as well as the result—authored by arbitrator Tenenbaum.[16] It offers two reasons for this broad reading of the award. *First*, it says, the parties jointly requested, and thus are bound by, a legal interpretation of the Opt–Out Clause. *Second*, although arbitrator Moses issued a one-page "concurring opinion," rather than sign the forty-seven-page Arbitration Decision written by arbitrator Tenenbaum, these two opinions were legal equivalents, containing identical interpretations of the Opt–Out Clause as well as agreement about the annual rent.

As a result, contends the Tenant, arbitrators Tenenbaum and Moses, constituting a 2–1 majority, must be said to have signed an agreed-upon award composed of a monetary ruling and a legal elaboration in conformity with Article XII of the Lease.

■ Before considering these contentions, it is important to note that they are properly before this court; they need not await resolution in a later arbitration proceeding. Although presumably the Tenant could have waited to raise them, in arguing for their preclusive effect, when the next decennial rent adjustment is at issue in 2014, the Tenant is entitled to their consideration at this time, in this court, because of the allegation that they are *expressly* a part of the 2004 arbitration award that has been presented for judicial confirmation, not merely implicit in it[17]—as would be the argument down the road in 2014.

## A.

■ In addressing the Tenant's first proposition—that both parties asked the arbitrators to issue a legal ruling interpreting the Opt–Out Clause—we begin with perhaps the obvious observation that arbitrators are required to rule on all the issues, but on no more than the issues, the parties submit; the parties themselves determine the universe for decision.[18] So how can one tell for sure what issues have been submitted? When a dollar figure is

---

15. *See United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 764, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983); *Tauber & Assocs.*, 738 A.2d at 1219; *Poire*, 491 A.2d at 534.

16. At oral argument, however, counsel for the Tenant limited the request for incorporation of the Arbitration Decision to the paragraphs under the final heading ("Conclusion").

17. *See, e.g., Shaff,* 617 A.2d at 963 n. 9.

18. Ohm, 3 COMMERCIAL ARBITRATION (3d ed. 2007) § 115:5 ("In an award, the arbitrator must decide all issues submitted," but "the arbitrator's authority is exceeded when deciding matters not submitted"); *see Poire,* 491 A.2d at 533 n. 6 ("parties to an arbitration agreement cannot be required to submit to arbitration matters that they did not agree would be the subject of arbitration" (citations omitted)); *cf. Shore,* 877 A.2d at 95 ("[a]n arbitration award is deemed final as long as it shows an intention to resolve the issues submitted").

sought by both parties, such as a rent level, that issue is unquestionably presented; otherwise, the arbitrator would lack an assignment. But the question whether the rationale for that decision is also a submitted issue, requiring written reasons for decision by the arbitrator—or whether the arbitrator can volunteer reasons as part of the award without being asked—is more complicated.

■ In the first place, arbitrators commonly do not offer reasons for decision [19]- indeed, under American Arbitration Association rules (not relevant here), arbitrators presumptively do not.[20] Typically, therefore, as this court has noted, an arbitrator issues a short and concise statement of the result,[21] less often a more elaborate, "reasoned award" that "sets forth findings of fact and conclusions of law," or perhaps even a "judicial-type opinion."[22]

In this case, the parties did not formally request, by joint submission, that the arbitrators announce a rationale for decision. On the other hand, both parties argued vigorously their respective views of the interpretive premise—inflation index or land value—on which the arbitrators should base their decision. The fact that a party argues a legal basis for decision, of course, does not in itself suggest that the party is requesting a ruling on that rationale; one can seek a dollar result, for example, without necessarily wanting a ruling—potentially with preclusive effect—on the reasons for decision. When, however, a dollar calculation requested by both parties necessarily depends, preliminarily, on selection of one rationale over another

for that calculation (in contrast with mixed rationales that yield a hybrid result), it may be difficult to argue that the request for calculation excluded all desire for a written expression of that reasoning.

In denying the Tenant's 2004 motion for a stay of the Landlord's demand for arbitration, after rejecting (without prejudice) the Tenant's contention that the 1994 arbitration award had established an inflation index rationale for future years, the 2004 panel majority concluded:

> While an adjudicator might ultimately find that the original parties to the Ground Lease intended that the rental adjustment must always be an inflation-based index or inflation based formula (or for that matter, that it be a value based index or formula), it is certainly not obvious from words of the Ground Lease or the awards made in the prior arbitration proceedings, that the parties are bound in 2004 and after to a particular adjudicated determination of those questions. [Footnote omitted.]
>
> Accordingly, and applying the plain words of the Ground lease, once the Landlord notified Tenant of its contention that the CPI Formula was no longer applicable for purposes of the Ground Lease, the Landlord was entitled to have the parties (or, if they could not agree, an arbitration panel) consider the threshold question of whether there are reasonable grounds to conclude that the CPI Formula is no longer applicable for purposes of the Ground Lease. *It should be noted that if the parties wish*

---

19. *See Lopata,* 735 A.2d at 940 ("An arbitrator is not required to explain the reason for a damage award."); *Poire,* 491 A.2d at 534 ("That the arbitrator did not spell out his interpretation of the joint venture agreement does not make the award invalid.").

20. Oehmke, 3 COMMERCIAL ARBITRATION (3d ed.2007) § 117:4

21. *See Poire,* 491 A.2d at 534 (citing *United Steelworkers of Am. v. Enter. Wheel & Car Corp.,* 363 U.S. 593, 598, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)).

22. Oehmke, 3 COMMERCIAL ARBITRATION §§ 115:6; 117:4.

*to do so, they may request that this arbitration panel, in addition to deciding the issues regarding the 2004 rent adjustment that have been submitted to arbitration, resolve other matters in dispute in a manner which might establish principles that would be applicable to future decennial adjustments under the Ground Lease.* But the Panel believes that it has not yet been demonstrated that the outcome reached by virtue of the Amended 1995 Award [for the 1994 arbitration] was definitive on these issues. (Emphasis added.)

The Landlord takes the position that the parties never accepted the panel's invitation to submit "other matters," including the rationale for decision, for resolution as part of the "award." We conclude that the Landlord is wrong. In fact, as we shall explain, the rationale for decision is not an "other matter"; it is among "the issues regarding the 2004 rent adjustment that have been submitted to arbitration."

In its Demand for Arbitration, the Landlord submitted six issues, "including any matter that arises in connection with or in relation to" any of them. The arbitrators were to consider Issues 2, 3, 4, and 6 only "[i]f the answer to Issue 1 above is yes." [23] Issue 1 reads as follows:

Whether the Landlord has reasonable grounds for concluding that the rent adjustment formula set forth in Article I, Section 4 of the Lease, as modified by the Amended Initial and Final Award of Arbitrators executed on March 9–14, 1995, and transmitted to the parties on March 21, 1995, is no longer applicable for the purpose of the Lease.

The panel majority answered in the negative and calculated the dollar amount for the period 2004–2014 based on the CPI inflation index formula applied in 1995 (for the 1994 arbitration).

Did the parties ask the arbitrators to explain the rationale for their dollar decision? The answer is "yes." In the first place, the threshold issue before the arbitrators was the methodology or "formula" for calculating the rent adjustment; the dollar amount would come later, after methodology was resolved. The Landlord recognized that threshold requirement by submitting, as Issue I, the question whether there were "reasonable grounds" for abandoning the CPI Index used in calculating the "Amended Initial and Final award of Arbitrators" in 1995. Thereafter, as the parties tried the case, it was clear to all that resolution of Issue I required the arbitrators to answer an anterior, predicate question: whether the Opt–Out Clause in the Lease permitted the Landlord to seek a rent adjustment based on land value rather than inflation. [24] No other ground for the Landlord's proposal was offered or considered. In rejecting that proposal, therefore, the panel majority necessarily determined that a rent adjustment is limited to a calculation that accounts for inflation; land value is irrelevant. Accordingly, what the parties have conceptualized as a separate category—reasons or rationale for decision—is not that at all. Interpretation of the scope of the Opt–Out Clause-a determination necessary to resolving Issue I—is inherent in the very first issue submitted for arbitration, and thus the arbitrators were expected to answer it. The arbitrators' answer,

**23.** Issue 5 pertained only to the completion date for arbitration and the rent payable in the event that the arbitration was not completed before beyond November 1, 2004.

**24.** Conceptually, perhaps, this "anterior, predicate question" could be characterized in the alternative as a "rephrasing" of Issue 1. Either way, interpretation of the Opt–Out Clause was inherent in resolution of the Landlord's first submitted issue.

"No," to the Landlord's Issue 1 contained an indisputable reason-inflation index only—that was a fundamental part of the answer itself, not merely a supporting rationale. In the very submission of Issue 1, the Landlord asked for interpretation of the Opt–Out Clause. The arbitrators provided it.

The manner in which both parties presented their cases confirms this conclusion; we discern no desire by either one to limit the arbitrators to a one-word answer— "No"—to Issue 1, without accompanying explanation. In its arbitration brief, the Landlord stated as "Point I" its argument that a party "may opt out of the CPI–U-based [25] rent adjustment formula" if there are "reasonable grounds" for doing so, and asked the arbitrators to "adopt as the substitute formula for calculating the annual ground rent ... six percent (6%) of the fair market value of the land...." Later, at the arbitration hearing, Landlord's counsel concluded: "Our position is that these economic facts that I've just summarized demonstrate beyond a doubt that there are reasonable grounds to change the rent adjustment formula. We suggest that that formula should be 6 percent of land value.... [W]hen the parties are unable to come to an agreement, it falls to the arbitrators to stand in the shoes of the parties and, in my view, *come up with a new index that fits the new facts of the current time.*" (Emphasis added.) The Landlord, therefore, was proposing a formula that necessarily required an interpretation of the Opt–Out Clause that was flexible enough to accommodate a rent adjustment based on land value, not merely on inflation.

In response, counsel for the Tenant reaffirmed his client's position: "[W]e *want to end this once and for all and get a ruling*

*that the landlord can't keep doing what they've been trying to do the last three times.* ... Now the landlord wants to change this index lease to one based on the value of real estate. The evidence will show that this does effect a fundamental change in the character and the economics of the lease, so we've joined issue on this as to whether or not that can happen. I think the evidence will show you that it cannot." (Emphasis added.) The Landlord's counsel never negated the Tenant's representation highlighted here.

Later, during questions from the panel, arbitrator Von Salzen asked the Tenant's counsel: "[C]ould you tell me where we get the authority to decide anything other than the 2004 rent adjustment? Because I think you just said—and you said in your opening argument—that *you wanted us to decide that this must always be in an index lease.*" (Emphasis added.) To which Tenant's counsel replied: "[I]f you look at the arbitration clause itself in the ground lease, you will see that it certainly gives you the authority to decide that issue[,] especially since it's, in our view, a decision that's necessary to a construction of the clause of the lease *in deciding what should be done here going forward.*" (Emphasis added.) The Landlord's counsel never contradicted the Tenant's answer.

Both parties, therefore, asked the panel, as the basis for resolving Issue 1, for an interpretation of the Opt–Out Clause: was it limited to adjustment for inflation or flexible enough to adjust for land value? And it was clear from what arbitrators Tenenbaum and Moses wrote and signed that both intended their answer—inflation index only—to be part of the award.

**25.** According to the Landlord, the "CPI–U-based" formula is the "CPI–All Urban Consumers, U.S. City Average, All Items" index.

Throughout the proceedings this index was summarized, more succinctly, as the CPI.

## B.

▇ We have concluded that the arbitrators had before them a required interpretation of the Lease as part of the award. But did a panel majority "sign" the award, including that required interpretation? Art. XII of the Lease provides that "[i]n case there are three (3) arbitrators selected as above mentioned, an award in writing signed by any two of them shall be final." No one questions that two of the arbitrators, Tenenbaum and Moses, signed an award that calculated the rent due the Landlord for the period 2004–2014. The contested issue is whether the two also can be said, within the meaning of Art. XII, to have signed a broader award interpreting the Opt–Out Clause.[26]

If both arbitrators did sign, the Tenant will at least have room to argue that the 2006 award (derived from the 2004 arbitration) includes both of the components claimed: dollars and rationale. Otherwise not. We begin by noting that, in 2004, the Tenant responded to the Landlord's demand for arbitration by moving to dismiss the proceeding. The Tenant argued that the 1994 Arbitration had determined that rent under the ground lease could be adjusted only for inflation, not for increase in value, and that *res judicata* and/or collateral estoppel accordingly barred relitigation of that claim (or issue). Ruling on June 7, 2005, arbitrators Tenenbaum and Von Salzen, as noted earlier, denied the Tenant's motion without prejudice while Arbitrator Moses dissented, agreeing with the Tenant's preclusion rationale.

Then came the decision on the merits. In his 2006 "Arbitration Decision," Arbitrator Tenenbaum, ruled as a matter of law, by reference to contractual language, that the Lease authorized use of the Opt–Out Clause to change the index used to adjust the rent for inflation. But, he added, the lease did not allow broader use of that clause to change the rationale for adjusting the rent from inflation to a land value. Tenenbaum then buttressed that interpretation by relying on this court's *Worthington* decision.[27] He concluded that any use of the Opt–Out Clause beyond reconsideration of the particular inflation index to be used-the kind of tool expressly recognized in the Lease for revising the rent-would be tantamount to requiring the arbitrators to renegotiate the Lease without discernible criteria for doing so. Ab-

---

**26.** We interpret the requirement that two of three arbitrators "sign" the award to mean that they must agree on the essential terms, not literally sign the same piece of paper.

**27.** *George Y. Worthington & Son Mgmt. Corp. v. Levy,* 204 A.2d 334 (D.C.1964), concerned a dispute over an option to extend a ground lease for an additional five years "at a rent to be agreed upon by both parties, *such agreement to be based upon the prevailing fair rentals for similar property at that time.*" *Id.* at 335 (emphasis added). This court held that the trial judge had not exceeded his authority in determining the fair monthly rental because the option provided a means for calculating the rent in the event that the parties were unable to agree on rental terms. *Id.* at 337. The court recognized that the language of an option itself may provide sufficient clari-

ty to allow the court to determine appropriate relief, within the contemplation of the parties, in contrast with an open-ended provision that would improperly put the court in the position of "making a new contract for the parties." *Id.*

Applying *Worthington* to this case, arbitrator Tenenbaum concluded that the Landlord's broad interpretation of the Opt–Out Clause would violate *Worthington* "because such an interpretation would essentially require that the parties ... negotiate something new if one of them has reasonable grounds to be dissatisfied." Even if we were to disagree with Tenenbaum's reasoning, we would not review the award on the merits because the parties bargained for the panel's ruling without regard to its legal correctness. *See, e.g., Tauber & Assocs.,* 738 A.2d at 1219.

sent such criteria, the Lease would be unenforceable.

Arbitrator Moses issued a "concurring opinion" that states in full:

I concur in the Arbitration Decision by the majority of the Panel. I do so believing I am bound, as I stated in my Dissenting Opinion dated June 7, 2005, under the doctrine of res judicata, by the decision of the 1994 panel that held that the Consumer Price Index ("CPI"), not the Producer Price Index ("PPI") (the successor to the WPI), specified in the Lease was to be used by the parties. If I did not feel bound by the doctrine of res judicata, I would have found that the PPI was still applicable, Landlord having not established by a preponderance of the evidence "reasonable grounds ... that such Index is no longer applicable for the purpose of this lease."

Moses purported to "concur in the Arbitration Decision," but then straightaway cited res judicata—a purely legal defense—as his rationale for accepting the CPI that Tenenbaum also embraced. But for such preclusion, added Moses, he would have stayed with the PPI—the inflation index used before the 1994 arbitration proceeding—because in Moses's view the Landlord had not met the evidentiary test required to demonstrate that the PPI, as originally provided in the Lease, was "no longer applicable." Left to his own resolution of the merits, therefore, arbitrator Moses—by relying on the PPI—would have calculated a lower annual rent than the CPI-based rent calculated by his colleague, Tenenbaum.

At first blush, it would appear that Moses can be said *not* to have joined in the Tenenbaum "opinion" (or "decision") but to have merely concurred in the "result," arriving at the annual rent ($163,493.84) by a legal route (claim preclusion) that barred his preference for a different merits resolution less generous to the Landlord. But

that analysis is far too superficial and deals with the wrong question. By demanding arbitration, the Landlord pressed a threshold question—presented twice before, in 1984 and 1994—whether a rent adjustment under the Opt–Out Clause of the Lease can be premised on the reasonable value of the land. As to this question of allowable methodology, arbitrators Tenenbaum and Moses were in complete accord: the Landlord's valuation theory was unavailable under the Lease.

Tenenbaum made this clear in his "Arbitration Decision" of June 6, 2006:

[T]he majority would ... interpret the Opt–Out Clause in a manner which ... gives effect to the parties' original selection of the WPI-based COLA Formula, and the other structural aspects of the Lease which support the view that the escalation formula is *intended solely to provide the Landlords with inflation protection.* [Emphasis added.]

Moses expressly "concur[red] in the Arbitration Decision by the majority of the Panel"—language that embraced rationale as well as dollar calculation. And, like Tenenbaum, Moses had been clear during this proceeding how he interpreted the Opt–Out Clause. In his "Dissenting Opinion" of June 7, 2005, in which he argued for the first time that *res judicata* barred the panel from rejecting the CPI approach adopted by another panel In 1994, Moses unequivocally rejected the Landlord's valuation theory:

In short, the Lease taken as a whole does not permit the phrase, "the purpose of this lease," to be read to give the Landowners an interest in the value of the land for the Lease Term....The Lease, read as a whole, *compels the use of an inflation index.* Landowners parted with the value of the land for 99 years when they signed the Lease in 1960. [Emphasis added.]

Whatever differences these two arbitrators eventually might have had in applying an inflation index to calculation of the rent adjustment, had Moses felt free to question use of the CPI, those differences would have been irrelevant to their shared view that the Landlord's approach was unacceptable. Tenenbaum and Moses, therefore, may have arrived at the same annual rent by different routes, but on the way they agreed absolutely that the Landlord's proposal could not be accommodated under the Lease.

In sum, because arbitrators Tenenbaum and Moses both concluded as a matter of law—albeit in separate opinions—that the Opt–Out Clause of the Lease limits the landlord to rent adjustments based only on inflation, we are satisfied that they both signed at least two determinations at the heart of the "Arbitration Decision": (1) the dollar amount of annual rent ($163,493.84) for the period 2004–2014, and (2) a rejection of the landlord's valuation theory as a basis for calculating rent under the Opt–Out Clause.

## IV.

Finally, each party claims entitlement to attorney fees and related costs. The Tenant asks for them in connection with pursuing its Motion to Confirm Arbitration Award in the trial court and on appeal; the Landlord seeks them only in connection with this appeal. We conclude that neither party is entitled to fees or costs.

 Asserting that the DCAA applies to the fee issue, the Tenant cites D.C.Code § 16–4313 (2001), which provides that after the trial court has confirmed, modified, or corrected an arbitration award and judgment has been entered, "[c]osts of the application and of the proceedings subsequent thereto, and disbursements may be awarded by the Court." Assuming, without deciding, that "costs" would include "attorney fees" in this context,[28] we cannot accept the Tenant's argument. As noted above in Part II, the DCAA does not apply to arbitration agreements entered into before enactment of the DCAA in 1977, unless amended thereafter (which has not occurred here).[29] The Tenant offers no persuasive reason why the costs provision should be applied to this 1959 Lease while other provisions of the DCAA are inapplicable.

Tenant notes, initially, that the Landlord's Motion to Compel Arbitration cited the DCAA, D.C.Code § 16–4302(a), in addition to Super. Ct. Civ. R. 70–I, as grounds for getting into court, and contends that the parties accordingly had adopted the DCAA for purposes of this case. That argument has no heft.

 Tenant next argues that, because the Landlord did not cite any of the five bases for vacating the award under the DCAA, D.C.Code § 16–4311(a), *supra* note 12, the award—including the inflation index ruling under the Opt–Out Clause—should have received trial court confirmation (as we here hold), and accordingly that fees and costs should be awarded against the Landlord as losing party.[30] That argument, too, goes nowhere. Even if the DCAA were to apply, attorney fees

---

**28.** *See Blitz v. Beth Isaac Adas Israel Congregation,* 352 Md. 31, 720 A.2d 912, 918–20 (1998) (confirming that attorney fees "incurred both at trial and on appeal" are included in "disbursements" awardable under Uniform Arbitration Act).

**29.** *Compare Washington Auto. Co. v. 1828 L St. Assocs.,* 906 A.2d 869, 878 (D.C.2006)

(DCAA applicable to appraisal under 1962 lease because parties amended lease in 2003).

**30.** The Tenant adds that the award is also "subject to the Federal Arbitration Act, 9 U.S.C. §§ 9 & 13," a statement that we do not address because unnecessary to our merits disposition and because that Act has no attorney fee provision.

would be awardable in the court's discretion ("may be awarded") only because of "the losing party's unjustified refusal to comply with the award."[31] In this case, the Landlord has not refused to comply with anything; it has merely defended against the Tenant's effort to clarify the scope of the award, which the Tenant could have waited to clarify ten years hence, by invoking *res judicata* and collateral estoppel, if the Landlord again were to propose its land value theory when demanding arbitration under the Opt–Out Clause.

▮▮▮ The Landlord relies for its fee claim not on the DCAA but on Article XX of the Lease, which provides: "In case Landlord shall, without any fault on its part, be made a party to any litigation commenced by or against the Tenant, the Tenant shall pay all costs, expenses and reasonable attorney fees incurred by or against the Landlord by or in connection with such litigation." Construing the Lease as a whole, we are satisfied that the term "litigation" in Article XX is not intended to embrace arbitration proceedings and related court review in connection with decennial rent adjustments. As best interpreted, this provision is an indemnity clause intended to reimburse the Landlord for attorney fees and costs incurred in connection with litigation between the Tenant and third parties in which the Landlord is impleaded; it does not cover claims strictly between the contracting parties.[32] No other explanation for limiting attorney fees to the Landlord comes to mind, especially in light of language in Article I, Section 4 that not only anticipates arbitration but also provides that "[t]he expense of any such arbitration shall be borne equally by the Landlord and the Tenant." Even if that provision does not literally extend to confirmation or other court review of the arbitrators' award, it is highly improbable that the parties intended only for the Landlord, never the Tenant, to recover fees in connection with court review of a rent adjustment proceeding when either one of them could be the moving party.

▮▮▮ The only means by which either party may recover attorney fees, then, is under an exception to the "American Rule,"[33] which requires each party to bear its own legal fees unless one of three exceptions applies.[34] The prevailing party may recover fees and costs from the losing party if authorized by statute, by contract, or by the court's exercise of equitable power "when the interests of justice so require."[35] The latter, equitable exception is available when the court finds that the losing party has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons,"[36] or a prevailing class representa-

---

**31.** *Blitz,* 720 A.2d at 919.

**32.** *See, e.g., Tony Guiffre Dist. Co., Inc. v. Washington Metro. Area Trans. Auth.,* 740 F.2d 295, 298 (4th Cir.1984); *Ranger Constr. Co. v. Prince William County Sch. Bd.,* 605 F.2d 1298, 1304–05 (4th Cir.1979); *see also Safeway Stores, Inc. v. Chamberlain Protective Servs., Inc.,* 451 A.2d 66, 72 (D.C.1982) ("well-established that even where an indemnitee is entitled to recover attorney's fees incurred in resisting the indemnified claim, he is not entitled to recover the fees incurred in establishing the right to indemnity").

**33.** *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Jung v. Jung,* 844 A.2d 1099, 1107 (D.C.2004).

**34.** Attorney fees are also awardable under D.C.App. R. 38 as a sanction where an attorney "takes an appeal or files a petition or motion that is frivolous or interposed for an improper purpose, such as to harass or to cause unnecessary delay, or fails to comply with an order of this court."

**35.** *Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973).

**36.** *Id.; Jung,* 844 A.2d at 1107.

tive is eligible under the "common fund" doctrine.[37]

 To justify fee-shifting under the bad faith exception—the only exception potentially available to either party here—"bad faith conduct must be so egregious that fee shifting becomes warranted as a matter of equity."[38] "Bad faith may be found either in the initiation of a frivolous claim or in the manner in which a properly filed claim is subsequently litigated."[39] We assess allegations of bad faith conduct by examining whether the claim is entirely without merit "and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons."[40]

Nothing close to such conduct by either party is evident here. Both sides presented well crafted, strong arguments in good faith for their respective positions before the arbitrators, as evidenced not only by the briefs and record but also by the fact that the panel split 2–1 in its decision. The same high quality of performance is apparent from briefing and argument on appeal, for which this court is grateful. Each party, therefore, shall be left to pay its own fees and expenses.

## V.

The Landlord submitted for arbitration the question whether it had "reasonable grounds for concluding that the rent adjustment formula set forth in Article I, Section 4 of the Lease," as determined in the 1994 arbitration, "is no longer applicable for the purpose of the Lease." In order to answer that question, the parties contested whether the Lease permits the

Landlord to seek a rent adjustment based on land value rather than inflation; no other rationale for decision was considered. Two of the three arbitrators concluded that the Opt–Out Clause in Article I, Section 4 limits the "reasonable grounds" for changing the "index" used to calculate the rent adjustment to one that controls for inflation; the Landlord's land value alternative was rejected. Because this determination was necessary—in answer to Landlord's Issue 1—before the rent adjustment itself could be calculated, it is inherent in the award signed by a majority of the arbitrators, satisfying Article XII of the Lease.

Accordingly, it is ORDERED that the Confirmation of Arbitration Award on appeal is remanded for the trial court to amend the Confirmation by striking the last sentence—

> FURTHER ORDERED that this court declines to specifically adopt or reject any reasoning articulated by the arbitrators

and substituting therefor—

> FURTHER ORDERED that, pursuant to Article XII of the Ground Lease, a majority of the arbitrators (two of the three) have signed 'in writing' the following answer to the question that serves as a necessary predicate to the resolution of Issue I submitted by the Landlord: when either party notifies the other under Article I, Section 4 of the Ground Lease that the 'Index' used to calculate the rent adjustment 'is no longer applicable for the purpose of this lease,' the Opt–Out Clause in that Sec-

---

37. Under the "common fund" doctrine, courts may award attorney fees to a class representative where the representative's action "creates or traces a 'common fund,' the economic benefit of which is shared by all members of the class." *Hall,* 412 U.S. at 5–6 & n. 7, 93 S.Ct. 1943.

38. *Jung,* 844 A.2d at 1107 (citing *Gen. Fed'n of Women's Clubs v. Iron Gate Inn, Inc.,* 537 A.2d 1123, 1128 (D.C.1988)).

39. *Id.* at 1108 (citing *Synanon Found., Inc. v. Bernstein,* 517 A.2d 28, 38 (D.C.1986)).

40. *Id.*

tion limits the 'reasonable grounds' for changing 'such Index' to grounds that rely for proposed change on an Index that controls for inflation.

*So ordered.*