**CERTAIN UNDERWRITERS AT LLOYD'S LONDON, and Certain London Market Insurance Companies, Appellants,**

v.

**ASHLAND, INC., Appellee.**

**No. 07–CV–1004.**

District of Columbia Court of Appeals.

Argued Nov. 19, 2008.

Decided March 12, 2009.

P. Andrew Torrez, with whom Martin S. Himeles, Jr., Robert M. Flannery, and Robert W. Hesselbacher, Jr., were on the brief, for appellants.

John M. Sylvester, with whom Jeffrey A. Vitek, David T. Case, and Brendon P. Fowler, Washington, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, FISHER, Associate Judge, and KING, Senior Judge.

KING, Senior Judge:

Appellants, Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies (collectively, the "London Insurers"), appeal a trial court decision affirming an arbitrator's award in favor of appellee, Ashland, Inc. ("Ashland"). The arbitrator ruled that § 7(g) of a Coverage–in–Place Agreement ("CIP Agreement") between the parties placed a $10 million cap on payments owed by the London Insurers to Ashland in any given

year. The arbitrator also ruled that under § 7(f) of the CIP Agreement, the London Insurers were required to pay interest on any payments rolled over based on the cap imposed by § 7(g). The London Insurers argue that the trial court erred in affirming the arbitrator's decision because the arbitrator exceeded his authority in ruling on the § 7(f) interest issue, which the London Insurers argue was not properly submitted to the arbitrator. The London Insurers also argue that the trial court erred in affirming the arbitrator's decision because the § 7(f) interest issue is too speculative and too remote, and therefore does not present a live case or controversy. Because we must give great weight to the arbitrator's determination of the scope of the issues submitted for arbitration and because the interest issue under § 7(f) of the CIP Agreement is a live case or controversy, we disagree and affirm.

## I. Relevant Facts

Riley Stoker Corporation ("Riley Stoker"), a manufacturer of industrial boilers and a subsidiary of Ashland, has been named as a defendant in thousands of lawsuits that allege bodily injuries arising from exposure to asbestos contained in commercial boilers manufactured, installed, maintained and/or repaired by Riley Stoker. Liberty Mutual Insurance Company provided the primary insurance for Riley Stoker's asbestos products claims, while the London Insurers provided all or most of the excess insurance. In 1996, Ashland approached the London Insurers regarding insurance coverage for asbestos claims upon exhaustion of Liberty Mutual Insurance Company's primary coverage.

On April 21, 1998, the London Insurers and Ashland entered into a CIP Agreement regarding insurance coverage for asbestos claims against Riley Stoker. Section 7(f) of the CIP Agreement addresses interest payments due on late payments made by the London Insurers.[1] Section 7(g) of the CIP Agreement places a $10 million cap on payments made by the London Insurers in any single calendar year.[2] Pursuant to § 11 of the CIP Agreement, Ashland and the London Insurers agreed that all disputes (except disputes relating to exhaustion of primary insurance coverage) would be subject to binding arbitration in Washington, D.C., pursuant to the

---

1. Section 7(f) of the CIP Agreement states:

On a quarterly basis, Ashland shall deliver to the Representative of the London Market Insurers an invoice for amounts due and owing for the previous quarter, along with supporting documentation for all amounts invoiced.... Absent any objection or question by the London Market Insurers' Representative made within 60 days following receipt of the invoice, payment shall be made to Ashland within 90 days following receipt of the invoice with supporting documents. In the event of a timely objection or question by the London Market Insurers' Representative, the amounts subject to that objection or question shall not be payable until the objection or question is resolved. Such objection or question shall be resolved within 60 days of the objection or question. If the parties are unable to resolve the dispute within such 60 days, the dispute shall be subject to arbitration as set forth in paragraph 11.... For late payments, including amounts objected to or questioned by the London Market Insurers' Representative but which are later determined through arbitration to be due and owing to Ashland, interest at the rate of eight percent (8%) per annum shall be paid to Ashland calculated beginning on the 91st day following submission of the invoices which contain the amounts due.

2. Section 7(g) of the CIP Agreement states:

The London Market Insurers shall not be required to make payments to Ashland in excess of U.S. $10 million in any single calendar year pursuant to this Agreement. Any amounts due Ashland under this Agreement in excess of U.S. $10 million in any single calendar year shall roll forward to the next succeeding calendar year.

Commercial Arbitration Rules of the American Arbitration Association.[3]

In 2001, the London Insurers determined that Ashland's billing statements under the CIP Agreement for that year might reach the § 7(g) $10 million cap for the first time. On December 20, 2002, the London Insurers informed Ashland that it would invoke § 7(g) of the CIP Agreement to roll forward all payments due in 2002 in excess of the $10 million limit to the next year. The London Insurers and Ashland disputed the meaning of § 7(g) of the CIP Agreement. The London Insurers contended that under § 7(g) of the CIP Agreement, payments from the London Insurers to Ashland were capped at $10 million per year, with the excess rolled over to the following year for payment, subject to that year's cap. Under the London Insurers' interpretation, they could never pay more than $10 million in any calendar year. Ashland contended, on the other hand, that under § 7(g) of the CIP Agreement the London Insurers would have to pay all amounts deferred in any one year by January 1 of the following year along with up to $10 million in additional costs that year, should they be incurred.

While this dispute was ongoing, Ashland sent quarterly invoices to the London Insurers that billed the London Insurers for both the principal amounts that it believed were owed under the CIP Agreement and for interest on the principal that had been rolled over under § 7(g) of the CIP Agreement. The London Insurers

disputed their obligation to pay interest on principal amounts due under § 7(g) of the CIP Agreement in letters dated February 11, 2003, July 16, 2003, May 12, 2004, August 20, 2004, February 1, 2005, and May 24, 2006, stating that "[w]e do not consider Ashland's interest claim to be well-founded" and "Ashland's interest claim is inconsistent with the terms of the [CIP Agreement]." In these letters, the London Insurers argued that they did not owe interest on unpaid principal amounts because "by operation of the annual cap, these amounts could not have been paid, even if they were proven."

### 1. Arbitration Proceedings

The London Insurers and Ashland were unable to resolve their dispute over the meaning of § 7(f) and § 7(g) of the CIP Agreement. On July 21, 2004, Ashland invoked § 11 of the CIP Agreement and filed a Demand for Arbitration with the American Arbitration Association. Ashland stated in its Demand for Arbitration:

> The Agreement contains the following provision [§ 7(g)] relating to payments made by the London Insurers to Ashland: "The London Market Insurers shall not be required to make payments to Ashland in excess of U.S. $10 million in any single calendar year pursuant to this Agreement. Any amounts due Ashland under this Agreement in excess of U.S. $10 million in any single calendar year shall roll forward to the next succeeding calendar year." When read in context with the rest of the Agreement,

**3.** Section 11 of the CIP Agreement states in relevant part:

Except for any dispute relating to the exhaustion of any primary coverage, the Parties agree to submit any dispute arising out of this Agreement to binding arbitration by a single arbitrator under the auspices of the American Arbitration Association pursuant to its Commercial Arbitration Rules. Such

binding arbitration shall commence with the service of a written demand for arbitration with a copy to the American Arbitration Association. The arbitration will take place in Washington, D.C. consistent with the terms of the Federal Arbitration Act (9 U.S.C. section 1 et. seq.) with all issues to be decided under the law of Kentucky.

this provision provides that, if the amount due to Ashland for a calendar year's defense and indemnity costs exceeds $10 million, then the full amount of the excess is to be paid in the succeeding calendar year. However, the London Insurers have interpreted this provision to limit their total payment to $10 million per year, regardless of the calendar year that the defense and indemnity costs were incurred. Based on this interpretation, the London Insurers contend that defense and indemnity payments may be "roll[ed] forward" for multiple years. As a result, the London Insurers have failed to pay the full amount owing to Ashland and therefore are in breach of the Agreement and the policies. The amount owed by the London Insurers through March 31, 2004 is at least $17 million, exclusive of interest. Accordingly, Ashland seeks money damages for the breach of contract and a declaratory judgment setting forth Ashland's rights and [the London Insurers'] obligations under the Agreement and the policies.

The American Arbitration Association appointed the Honorable Raymond D. Williamson as the sole arbitrator of the dispute.

Arbitration proceedings continued for nearly two years, during which time Ashland and the London Insurers engaged in discovery. During discovery, Ashland and the London Insurers deposed various witnesses, who responded to questions regarding how interest payments under § 7(f) would apply to principal amounts deferred under § 7(g) of the CIP Agreement.[4] Following discovery, Judge Williamson conducted a three-week evidentiary hearing in October and December 2005, during which ten witnesses testified for Ashland and the London Insurers. During the hearing, Ashland witnesses testified regarding the interpretation of both § 7(f) and § 7(g) of the CIP Agreement. The London Insurers cross-examined Ash-

4. Counsel for the London Insurers asked one Ashland witness during his deposition, "Was there ever a discussion whether interest would be due on the amount that was carried forward?" During the same deposition, the London Insurers also asked, "Was there ever any discussion in any meeting with [the London Insurers] or in any telephone conversation of whether an amount that was not paid pursuant to 7G was a late payment?" The London Insurers asked another Ashland witness during his deposition, "do you have a view as to how the agreement operates with respect to interest and whether it applies to amounts not paid during one calendar year because they exceed $10 million and therefore paid subsequently?"

In addition, the following questions were posed during the depositions of four other witnesses for Ashland and the London Insurers: "Is there any language in the agreement that addresses the question of whether interest that is provided for in section 7 F would apply to amounts that are deferred by operation of section 7 G?" "Was there any other language in section 7 F that you believe ad-

dresses expressly the issue of whether amounts deferred under section 7 G are subject to the interest that is provided for in section 7 F?" "Do you recall any discussion ... prior to entering into the Ashland coverage-in-place agreement as to whether any interest would accrue with respect to amounts whose payments were deferred by operation of section 7(g)?" "Do you understand section 7(g) of the asbestos coverage-in-place agreement ... to operate such that Ashland has agreed to give ... an interest free loan of amounts due—of amounts invoiced pursuant to this agreement but whose payment is deferred by operation of section 7(g)?" "[D]o you have an understanding as to whether this agreement allows for the accrual of interest with respect to amounts that are invoiced by Ashland under the agreement but for which payment is deferred by virtue of the operation of section 7(g)?" "So then as you construe sections 7(f) and 7(g) together, the effect of 7(g) is to allow London to pay amounts that exceed $10 million in the next calendar year with 8 percent interest, and that's it?"

land's witnesses on these sections of the CIP Agreement and presented their own witnesses regarding their interpretation of whether the § 7(f) interest provision would apply to principal amounts deferred under § 7(g) of the CIP Agreement.

In a post-hearing brief, Ashland argued that it was entitled to eight percent interest on all amounts deferred under § 7(f) of the CIP Agreement, regardless of the meaning attributed to the § 7(g) cap provision. In their post-hearing brief, the London Insurers presented a contrary argument; Ashland reiterated its request for interest under § 7(f) of the CIP Agreement in its post-hearing reply brief.

On June 16, 2006, Judge Williamson issued an Interim Award, affirming the London Insurers' understanding of the meaning of § 7(g) of the CIP Agreement. Judge Williamson found that "7g means what it says: a maximum of 10 million dollars a year with any amounts over ten million going to next year and continuing to add up until fully paid (at 10 million dollars a year)." In addition, Judge Williamson stated:

> While Section 7(g) is clear on its face, a full picture of its impact on the Agreement and the parties must be viewed in conjunction with Section 7(f) which is raised and debated by the parties....
>
> Section 7(f) uses the terms "due" and "owing". While Section 7(g) provides a maximum amount payout, that status did not alter the terms and applicability of Section 7(f) which applies interest to any billing that is not paid within 90 days. Thus, while the $10 million maximum remains, so does the commencement of interest on the 91st day after a billing.
>
> Again, the $10,000,000.00 cap does not get raised by virtue of the interest due but the interest becomes part of the

total excess continuing to be carried over until the full amount is satisfied.

Prior to entry of his Final Award, Judge Williamson invited the parties to submit additional briefs. The London Insurers submitted a brief contending that the scope of submission did not include § 7(f) of the CIP Agreement and that Judge Williamson's holding regarding § 7(f) was not binding because there was no live case or controversy on the interest issue. Ashland responded, requesting that Judge Williamson reinforce his ruling on the London Insurers' obligation to pay interest under § 7(f) of the CIP Agreement because the interest issue was properly before Judge Williamson and presented an actual controversy. The parties submitted another round of briefs, disputing the London Insurers' obligation to pay interest under § 7(f) of the CIP Agreement.

Judge Williamson issued his final Award of Arbitration on December 13, 2006, denying the London Insurers' motion for reconsideration and incorporating the Interim Award in its entirety. Judge Williamson concluded:

> While it is true that [Ashland] did not refer to Section 7(f) of the Coverage in Place Agreement in its initial papers, the issue of interest and when it is due has come up throughout the Arbitration....
>
> [The London Insurers] have claimed throughout this Arbitration that interest did not apply on the millions of dollars "postponed" by the ruling in this case. Ashland *and the wording of Section 7(f)* maintain that interest starts to run on the 91st day following submission of the invoices which contain the amounts due at 8% per annum.
>
> An issue exists concerning whether interest is to be paid over and above and at the same time as the $10,000,000.00 annual payments. In other words, is

Ashland to expect interest payments in addition to the maximum $10,000,000.00 payment it can expect from [the London Insurers].

The Award requires only a total payment of $10,000,000.00 from [the London Insurers'] interests to Ashland. However, the Award does not cancel the wording of 7(f) that interest commences from the 91st day following submission of invoices to [the London Insurers] which contain the amounts due. Thus, interest accrues on the balances at 8% until all claims are fully paid.

## 2. Superior Court Proceedings

The London Insurers commenced the instant action in the Superior Court on March 13, 2007, seeking to modify in part Judge Williamson's Final Award on the ground that Judge Williamson's interpretation of § 7(f) of the CIP Agreement was not presented to the arbitrator for resolution and that the arbitrator therefore exceeded his authority in addressing the § 7(f) interest issue. Ashland filed an opposition to the London Insurers' application for relief and moved for confirmation of the Final Award. The London Insurers filed a reply brief, after which Ashland filed a surreply. The trial court granted Ashland's motion and confirmed the Final Award on July 30, 2007. It thereafter denied the London Insurers' application to modify the arbitration award with regard to the § 7(f) interest issue on August 6, 2007. The London Insurers appeal from both of these orders, arguing that the § 7(f) interest issue was not submitted to the arbitrator and that the § 7(f) interest issue does not constitute a live case or controversy. We disagree and affirm the arbitrator's award.

## II. Scope of the Submission

The London Insurers argue that Ashland did not submit the § 7(f) interest issue to the arbitrator and that the issue was therefore outside of the scope of the arbitrator's review. According to the London Insurers, Ashland conflated its uncontested claim for prejudgment interest—if it prevailed on the interpretation of § 7(g) of the CIP Agreement—with a new request for declaratory relief as to the meaning of the § 7(f) interest provision even if Ashland lost on the merits. The London Insurers argue that Ashland first raised the issue in a post-hearing brief and that the parties were denied the opportunity "to conduct extensive document and deposition discovery, offer direct testimony, conduct cross-examination, and brief the issue." According to the London Insurers, Ashland even resisted their efforts to compel discovery on everything except the § 7(g) $10 million cap issue. The London Insurers further claim that the portions of Judge Williamson's Final Award relating to the § 7(f) interest issue can easily be excised without affecting the merits of the Final Award on the issue of interpretation of the § 7(g) cap provision.

The CIP Agreement states that "all issues" will be decided under the law of Kentucky. Under Kentucky law, a court "shall" modify or correct an arbitration award where "[t]he arbitrators have awarded upon a matter not submitted to them and the award may be corrected without affecting the merits of the decision upon the issues submitted[.]" KY.REV. STAT. ANN. § 417.170(1)(b) (West 2008); *see also* D.C.Code § 16–4312(a)(2) (2001); 9 U.S.C. § 11(b) (2006).[5] In light of the

5. The laws of Kentucky, the District of Columbia, and the Federal Arbitration Act are essen-

tially identical with respect to these provisions. D.C.Code § 16–4312(a)(2) states:

deferential standard of review that we must afford the arbitrator in his determination of the scope of the submission, we conclude that the London Insurers' arguments must fail.

## 1. Standard of Review

█ Initially, we must determine what standard of review to apply. We are satisfied that our standard of review here depends on whether we are faced with a challenge to the scope of a submission or a challenge to arbitrability of the issue decided.[6] Arbitrability refers to whether the parties agreed to arbitrate a particular type of issue and is subject to *de novo* review. *See Motor City Drive, L.L.C. v. Brennan Beer Gorman Monk Architects & Interiors, P.L.L.C.*, 890 A.2d 233, 236 (D.C. 2006); *see also Ballard & Assocs., Inc. v. Mangum*, 368 A.2d 548, 551 (D.C.1977) ("Arbitration is predicated upon the consent of the parties to a dispute, and the determination of whether the parties have consented to arbitrate is a matter to be determined by the courts on the basis of the contracts between the parties."). The District of Columbia Circuit addressed the standard of review for arbitrability challenges in *Davis v. Chevy Chase Fin. Ltd.*, holding that "[w]here … a party to an arbitration proceeding challenges the arbitrator's authority to decide a particular issue, the function of a reviewing court is distinctly different [from review of matters concededly within the jurisdiction of the arbitrator]. The threshold question of arbitrability is one of law, and a reviewing court is obligated to make its own determination of the issue." 215 U.S.App. D.C. 117, 123–24, 667 F.2d 160, 166–67 (1981) (internal citation omitted). The court in *Davis* concluded that "an arbitral award regarding a matter not within the scope of the governing arbitration clause is one made in excess of authority, and a court is precluded from giving effect to such an award." *Id.* at 122, 667 F.2d at 165 (internal citations omitted). In sum, judicial review on the determination of arbitrability is *de novo*.

On the other hand, the determination by the arbitrator of the scope of a submission, which is the issue presented here, refers to whether a particular issue, which is indisputably arbitrable,[7] was submitted to the arbitrator in a specific arbitration proceeding, and is accorded a significant amount of deference. *See Madison Hotel v. Hotel & Rest. Employees, Local 25*, 330 U.S.App. D.C. 212, 214 n. 1, 144 F.3d 855, 857 n. 1

---

(a) Upon application made within ninety days after delivery of a copy of the award to the applicant, the Court shall modify or correct the award where:

\* \* \*

(2) The arbitrators have awarded upon matter not submitted to them and the award may be corrected without affecting the merits of the decision upon the issues submitted[.]

Similarly, 9 U.S.C. § 11(b) states:

In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

**6.** Both parties acknowledge the distinction between arbitrability and scope-of-the-submission issues. The London Insurers, however, contend that the "same sort of analysis" applies to both arbitrability and scope-of-the-submission disputes. We disagree for the reasons stated above.

**7.** Both parties stated in their briefs and at oral argument that the governing issue is the appropriate standard of review for scope-of-the-submission, and not arbitrability, disputes. Counsel for the London Insurers stated at oral argument that the London Insurers are not contesting the arbitrability of either § 7(f) or § 7(g) of the CIP Agreement.

**174** 

(1998) ("This question—the scope of the submission to the arbitrator—should not be confused with the question of arbitrability—whether the [parties] agreed ... to put a particular issue to arbitration. The latter question is reviewed by a federal court *de novo*. ... The former, as we have just indicated, is not.") (internal citations omitted).[8]

 We have never before detailed a precise standard of review for an arbitrator's determination of whether a contested

issue falls within the scope of a submission.[9] In *Madison Hotel*, however, the District of Columbia Circuit held that "[a]n arbitrator's view of the issues submitted to him for arbitration ... receives the same judicial deference as an arbitrator's interpretation of a collective bargaining agreement." *Id.* at 214, 144 F.3d at 857. Although *Madison Hotel* involved a situation where there was no formal submission for arbitration, the court looked to "what the parties believed they were arbitrating, and what the arbitrator believed he had been

**8.** *See Schoenduve Corp. v. Lucent Techs., Inc.*, 442 F.3d 727, 733 (9th Cir.2006) ("[T]he arbitrator's interpretation of the scope of his powers is entitled to the same level of deference as his determination on the merits.") (internal citations omitted); *American Postal Workers Union, Milwaukee Local v. Runyon*, 185 F.3d 832, 835 (7th Cir.1999) ("The arbitrator's interpretation of the scope of the issue must be upheld so long as it is rationally derived from the parties' submission") (internal citation omitted); *International Ass'n of Machinists & Aerospace Workers v. Tennessee Valley Auth.*, 155 F.3d 767, 772 (6th Cir.1998) ("[A]n arbitration award may not be overturned unless it is 'clear' the arbitrator 'exceeded the scope of the submission.'") (quoting *Champion Int'l Corp. v. United Paperworkers Int'l Union*, 779 F.2d 328, 335 (6th Cir.1985)); *Matteson v. Ryder Sys. Inc.*, 99 F.3d 108, 113 (3d Cir.1996) ("[T]here is no doubt that our review of the interpretation of a submission is highly deferential."); *Richmond, Fredericksburg & Potomac R.R. Co. v. Transp. Commc'ns Int'l Union*, 973 F.2d 276, 280 (4th Cir.1992) (holding that the arbitrator's interpretation of the scope of the submission "must be upheld so long as it is rationally derived from the parties' submission.") (citing *High Concrete Structures, Inc. v. United Elec. & Mach. Workers of Am., Local 166*, 879 F.2d 1215, 1219 (3d Cir.1989)) (additional citation omitted); *Lattimer–Stevens Co. v. United Steelworkers of Am., District 27*, 913 F.2d 1166, 1170 (6th Cir.1990) (noting that "the extraordinary deference given to an arbitrator's ultimate decision on the merits applies equally to an arbitrator's decision that the parties have indeed submitted a particular issue for arbitration.") (quoting *Champion Int'l Corp., supra*, 779 F.2d at 335); *Pack Concrete, Inc. v. Cunning-*

*ham*, 866 F.2d 283, 286 (9th Cir.1989) (deferring to the arbitrator's "plausible interpretation" of the scope of the issue submitted) (quoting *George Day Constr. Co. v. United Bhd. of Carpenters & Joiners of Am., Local 354*, 722 F.2d 1471, 1477 (9th Cir.1984)); *Mobil Oil Corp. v. Indep. Oil Workers Union*, 679 F.2d 299, 303 (3d Cir.1982) (reviewing scope of submission issue for whether the interpretation is "so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling.") (quoting *Safeway Stores v. Amer. Bakery Workers, Local 111*, 390 F.2d 79, 82 (5th Cir.1968)).

**9.** We generally afford great deference to an arbitrator's decision. *See Schwartz v. Chow*, 867 A.2d 230, 233 (D.C.2005) ("It is firmly established that '[j]udicial' review of an arbitrator's decision is extremely limited, and a party seeking to set it aside has a heavy burden.'") (quoting *Lopata v. Coyne*, 735 A.2d 931, 940 (D.C.1999)); *Shore v. Groom Law Group*, 877 A.2d 86, 91 (D.C.2005) ("It is firmly established that '[j]udicial review of arbitration awards is limited.'") (citing *Brandon v. Hines*, 439 A.2d 496, 509 (D.C.1981)); *Sindler v. Batleman*, 416 A.2d 238, 242 (D.C. 1980) ("Judicial review of arbitration awards is limited. An Award should not be vacated by the court as long as it was within the arbitrator's authority to determine the issue(s)."). "This limited review serves to attain a balance between the need for speedy, inexpensive dispute resolution, on the one hand, and the need to establish justified confidence in arbitration among the public, on the other." *Cathedral Ave. Coop., Inc. v. Carter*, 947 A.2d 1143, 1151 (D.C.2008) (internal citations omitted).

called upon to resolve." *Id.* at 215, 144 F.3d at 858. While *Madison Hotel,* of course, does not provide binding precedent, we think it useful in informing our analysis of the appropriate standard of review to apply in these circumstances.

Here, Judge Williamson clearly set forth what he believed to be the scope of Ashland's submission. In the Interim Award, he noted that § 7(f) was "raised and debated by the parties." In addition, Judge Williamson stated in his Final Award, "While it is true that [Ashland] did not refer to Section 7(f) of the Coverage in Place Agreement in its initial papers, the issue of interest and when it is due has come up throughout the Arbitration." He also noted that "[the London Insurers] have claimed throughout this arbitration that interest did not apply on the millions of dollars 'postponed' by the ruling in this case." Judge Williamson then ruled that the § 7(f) interest issue was briefed and argued by the parties and was inextricably intertwined with the § 7(g) cap issue. We conclude that we should apply a deferential standard of review to that ruling.

In support of our determination that a deferential standard of review is appropriate when reviewing an arbitrator's determination of the scope of a submission, we note that Ashland and the London Insurers expressly incorporated the American Arbitration Association's Commercial Arbitration Rules,[10] which state, "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." R. 7(a) (Sept. 1, 2007), *available at* http://www.adr.org/sp.asp?id=22440. Such an express agreement speaks to the parties' intent and supports our conclusion that we owe great deference to the arbitrator's determination of the scope of the submission. *See generally Friend v. Friend,* 609 A.2d 1137, 1139 (D.C.1992) ("A motion to compel arbitration invokes the well-established preference for arbitration when the parties have expressed a willingness to arbitrate. Federal and District of Columbia statutes are in agreement on the issue of favoring arbitration when the parties have entered into a contract containing an arbitration clause.") (internal citations and quotation marks omitted).[11]

▇▇▇ In further support of our conclusion regarding the applicable standard of review, we note that pleading requirements in arbitration proceedings are generally relaxed. *See* Richard Chernick & Rufus V. Rhoades, *How to Conduct a Complex Financial Arbitration Part I: Matters to Consider Prior to the Hearings,* 1440 PRACTICING LAW INST., CORP. LAW AND PRAC. COURSE HANDBOOK SERIES 453, 456 (2004) ("A Statement of Claim or Demand for Arbitration is a far different document than a Complaint in litigation. A claim is much more informal than a pleading and is usually much shorter. There are virtually no 'rules of pleading' in arbitration, and motions to dismiss are almost always denied; technical pleading rules need not be followed."); Laurence S. Moy, *Preparing for Arbitration: A Plaintiff Lawyer's*

---

10. Section 11 of the CIP Agreement states, "[T]he Parties agree to submit any dispute arising out of this Agreement to binding arbitration by a single arbitrator under the auspices of the American Arbitration Association pursuant to its Commercial Arbitration Rules."

11. The cases cited by the London Insurers that impose a strict interpretation of the arbitrator's authority to determine the scope of a submission do not refer specifically to instances where the parties have expressly granted the arbitrator the authority to determine his jurisdiction. *See, e.g., Luvaas Family Farms v. Ferrell Family Farms,* 106 Wash. App. 399, 23 P.3d 1111 (2001).

*View,* in How ADR Works 635, 636–37 (Norman Brand, ed., ABA Section of Labor and Employment Law, 2002) ("Formal and technical procedural rules, including pleading requirements, do not govern arbitrations. Thus, the likelihood of arbitrators dismissing ... claims outright based on what is said or not said in the statement of claim is relatively slight."). The American Arbitration Association's Commercial Arbitration Rules, which govern the dispute at issue here, merely require that a demand for arbitration "contain *a statement setting forth the nature of the dispute,* the names and addresses of all other parties, the amount involved, if any, the remedy sought, and the hearing locale requested." R. 4(a)(i) (emphasis added). In light of the pleading requirements under the American Arbitration Association's Commercial Arbitration Rules, as well as our deferential standard of review of an arbitrator's determination of the scope of a submission, we are satisfied that Judge Williamson did not exceed his authority in deciding that the § 7(f) interest issue could properly be considered to be within the scope of the submission, especially in light of the parties, including the London Insurers, having addressed the issue throughout the arbitration.

The London Insurers, however, rely mainly on *Atlantic Painting & Contracting, Inc. v. Nashville Bridge Co.,* 670 S.W.2d 841 (Ky.1984), to argue for a *de novo* standard of review for scope-of-the-submission disputes. According to the London Insurers, Ashland is attempting to recharacterize the underlying arbitration "to take advantage of relief it never sought on matters neither party intended to submit to the arbitrator." The London Insurers posit that regardless of whether the § 7(f) interest issue arose subsequent to Ashland's Demand for Arbitration, and regardless of whether the London Insurers engaged in discovery and argued the issue,

the § 7(f) interest issue exceeds the scope of Ashland's submission and was therefore impermissibly decided by Judge Williamson. For the reasons stated below, we disagree.

*Atlantic Painting* involved an arbitrator's determination of whether Atlantic Painting's claim that it was entitled to additional costs for Nashville Bridge Company's delay in completion of a bridge project was subject to arbitration. *Id.* at 843. The arbitration demand described the issue as, "[w]hether, under the contract involved in the matter, is the question of escalated costs of labor and materials resulting from construction delays, subject to arbitration under the terms of the subject contract." *Id.* The arbitrator first held that Atlantic Painting could make a claim for delay damages and then determined that Atlantic Painting was not entitled to delay damages because of its failure to provide notice to the Nashville Bridge Company. *Id.* at 844. The Supreme Court of Kentucky concluded that "[t]he issue before the arbitrator was the question of arbitrability," and the arbitrator "went beyond the issue submitted to make a factual determination [regarding the notice issue]." *Id.* at 845.

We are satisfied that the London Insurers' reliance on *Atlantic Painting* is misplaced because in that case the parties only asked the arbitrator to determine whether the issue was arbitrable, a determination, as we said above, which is reviewed *de novo.* In addition, the arbitrator in *Atlantic Painting* exceeded the authority granted to the arbitrator by the parties when the arbitrator then ruled on the merits of the issue. Here, on the other hand, Ashland and the London Insurers do not dispute the arbitrability of the § 7(f) interest issue and the § 7(g)

$10 million cap.[12] Rather, Ashland and the London Insurers disagree on the arbitrator's authority to decide the § 7(f) interest issue where Ashland did not mention specifically that provision of the CIP Agreement in its arbitration demand. Because we owe great deference to an arbitrator's determination of the scope of Ashland's demand for arbitration, we must uphold the arbitrator's determination that the § 7(f) interest issue was within the scope of Ashland's demand for arbitration.[13]

## 2. Prejudice

In addition, the level of prejudice suffered by the parties in *Atlantic Painting* is distinct from any prejudice allegedly suffered by the London Insurers here. The Supreme Court of Kentucky held in *Atlantic Painting* that "[a]n arbitrator's decision on a matter not submitted to him for his decision is void and not binding on the courts or anybody else." 670 S.W.2d at 845. The Supreme Court of Kentucky cited a California federal district court case stating, "This court will not say that plaintiff 'recognized' the arbitrator's authority merely because it ... took the added precaution of arguing those issues on the merits once it appeared the arbitrator had decided to include them in his consideration." *Id.* at 846 (citing *Delta Lines, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers, Local 85*, 409 F.Supp. 873, 875–76 (N.D.Cal.1976)). Unlike *Atlantic Painting*, where opposing counsel "only incidentally" briefed the additional issue and

where "that counsel was neither prepared to meet this new issue, nor seeking to enlarge the scope of the submission," the relationship between the § 7(f) interest provision and the § 7(g) cap provision at issue here was argued and briefed throughout the arbitration proceedings.

We also note that it was natural for the arbitrator to analyze the § 7(f) interest issue in analyzing the § 7(g) $10 million cap issue because they are logically intertwined. Because the § 7(f) interest issue is a necessary component of a determination regarding the § 7(g) $10 million cap issue, Judge Williamson's decision regarding the § 7(f) interest issue "necessarily arose" during the arbitration. *Schoenduve Corp.*, *supra* note 8, 442 F.3d at 732–33 (holding that the arbitrator "necessarily had the authority to decide" a damages issue that was "implicit within the submission agreement.") (citing *Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826, 830 (9th Cir.1995) (holding that an arbitration panel did not exceed its authority when the "question of the conditions of reimbursement was implicit in the submission" and the contract requiring arbitration "did not preclude the arbitration panel from resolving issues implied in the submission and did not limit the form or content of the award.")); *see also Madison Hotel*, *supra*, 330 U.S.App. D.C. at 215, 144 F.3d at 858 ("As is commonplace in arbitration proceedings, the scope of the issues developed informally during the course of the parties' presentations.").

---

**12.** Section 11 of the CIP Agreement states that "[e]xcept for any dispute relating to the exhaustion of any primary coverage, the Parties agree to submit *any dispute arising out of this Agreement* to binding arbitration" (emphasis added).

**13.** In addition, the London Insurers' reliance on *Pacific Development, L.C. v. Orton*, 23 P.3d 1035, 1038 (Utah 2001), is misplaced because

the arbitration agreement between Ashland and the London Insurers, unlike the agreement in *Pacific Development*, did not "specifically preclude[ ]" the contested interest issue. Here, Ashland submitted the § 7(g) $10 million cap issue to arbitration on the merits and the arbitrator determined that the § 7(f) interest issue was inextricably linked to the merits of the § 7(g) $10 million cap issue.

Ultimately, the London Insurers were not prejudiced where various employees of Ashland and the London Insurers responded to questions during their depositions regarding whether the § 7(f) interest provision applied to principal amounts not paid due to the $10 million cap under § 7(g). *See supra* note 4. Although the London Insurers argue that they were confused when Ashland witnesses began to testify as to the interpretation of Section 7(f) during the hearing, the London Insurers were able to argue that the § 7(f) interest provision did not apply throughout the arbitration proceedings and therefore suffered no prejudice as a result of Judge Williamson's decision to address the interest issue in his Interim Award and Final Award.[14]

### III. Live Case or Controversy

Finally, the London Insurers' additional claim that the trial court committed reversible error in affirming the arbitration award because there is no actual controversy with respect to the § 7(f) interest provision must also fail. The London Insurers contend that because they owe such a substantial amount to Ashland in principal, they will not pay interest under the CIP Agreement for "years or decades" and Ashland will receive "the exact same dollar amount regardless of how § 7(f) is construed." Although the London Insurers are correct that this court will not issue advisory opinions on issues that may or may not arise, *see District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 182 (D.C.1993), cases that present issues ripe for judicial resolution are properly considered justiciable. *See Smith v. Smith*, 310 A.2d 229, 231 (D.C.1973). The London Insurers' claim that the dispute "cannot possibly be ripe" fails because the issue at

hand revolves around interest payments under § 7(f) of the CIP Agreement that are due on a principal balance that is outstanding as of today and not some far-removed event that may or may not occur. Whether the London Insurers will make those payments years from now is irrelevant.

Because Judge Williamson properly exercised jurisdiction over the interest issue, and because interest payments due constitute a particularized, immediate harm, we affirm.

*So ordered.*

---

**14.** Because we conclude that Judge Williamson did not err in his conclusion that the § 7(f) interest issue was within the scope of the submission, we need not consider whether this portion of his Final Order could be excised under KY.REV.STAT. ANN. § 417.170.