*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CV-326

UNIVERSITY OF THE DISTRICT OF COLUMBIA FACULTY ASSOCIATION / NATIONAL EDUCATION ASSOCIATION, APPELLANT,

v.

BOARD OF TRUSTEES OF THE UNIVERSITY OF THE DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CAB-8603-18)

(Hon. Fern Flanagan Saddler, Motions Judge)

(Submitted April 29, 2020                    Decided August 26, 2021)

*Jonathan G. Axelrod* was on the brief for appellant.

*Anessa Abrams* and *B. Patrice Clair* were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN and BECKWITH, *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*: Appellant University of the District of Columbia Faculty Association / National Education Association (the "Faculty Association") appeals the trial court's decision granting a motion to stay arbitration filed by appellee Board of Trustees of the University of the District of Columbia (the

"University").  After the University denied the tenure application of Associate Professor Dr. Nikolai Ostapenko, it issued him a contract for the 2016-2017 academic year and then did not continue his employment for the 2017-2018 year. Pursuant to the parties' collective bargaining agreement, the Faculty Association, on Dr. Ostapenko's behalf, filed a grievance alleging violations of that agreement and later requested arbitration pursuant to the agreement's arbitration provision. However, the University then sought to stay the arbitration proceedings in the Superior Court, arguing that Dr. Ostapenko's dispute was not arbitrable.  The trial court agreed.

Construing the parties' collective bargaining agreement, we hold that the University's decision to grant Dr. Ostapenko a contract upon the denial of his tenure application was not arbitrable because it was a "tenure decision" that, in Article XIV ("University Tenure") of the agreement, the parties expressly excluded from the scope of arbitration.  In addition, Dr. Ostapenko was not entitled to arbitrate the University's non-renewal of his one-year contract in 2017 because he then was no longer a member of the bargaining unit covered by the Agreement; therefore, he could not allege a violation under Article XI ("Disciplinary/Adverse Actions").  We affirm the trial court's rulings.

## I. Factual & Procedural History

### A. The Collective Bargaining Agreement

The governing collective bargaining agreement between the University and the Faculty Association, entitled the "Seventh Master Agreement" (the "Agreement"), sets forth the "terms and conditions of employment for faculty represented by the association and negotiated by the parties."[1] The Faculty Association is the certified "bargaining agent" under the Agreement, and the employees who comprise the "bargaining unit" are "full-time faculty employees holding a permanent appointment from appropriated funds," with certain exceptions not relevant here. The Agreement includes policies regarding discipline and adverse actions (Article XI), tenure (Article XIV), academic evaluations (Article XV), promotions (Article XVI), compensation (Article XVIII), and reductions in force (Article XXI), among others. Article IX of the Agreement outlines the process for filing a grievance – defined as "a formal written complaint that there has been a violation, misinterpretation, or improper application of the terms and conditions of this Agreement" – and authorizes arbitration of such disputes.

---

[1] While the Seventh Master Agreement was effective May 22 through September 30, 2015, its terms have rolled over continuously since then, and both parties agree that it controls.

Relevant here, Article XIV of the Agreement allows "[f]ull-time faculty members who have been placed by the University in tenure tract [*sic*] positions" to apply for tenure "following the[ir] fifth year of service" in such a position. However, the Agreement specifically excludes "[d]ecisions regarding tenure" from the grievance and arbitration procedure (Article IX) and makes clear that such decisions "shall not be considered disciplinary or adverse actions," as defined by Article XI. Per Article XI, a "disciplinary or adverse action" – defined as "a written reprimand, suspension or dismissal" – may only be made for "cause." Article XXX, the "Entire Agreement" clause, provides that all "[m]atters not directly covered by this Agreement shall be governed by applicable D.C. regulations and law."

## B. The University's Denial of Dr. Ostapenko's Tenure Application

Dr. Ostapenko holds a Ph.D. in Economics from Leningrad University and a Ph.D. in Economic Theory with a concentration in Marketing from St. Petersburg University. In 2006, he began working at the University of the District of Columbia ("UDC") as a Visiting Associate Professor. In 2008, UDC hired Dr. Ostapenko as a tenure-track Associate Professor of Marketing in the School of Business and Public Administration ("SBPA"), at which time Dr. Ostapenko became a member of the

Faculty Association's bargaining unit. On March 21, 2013, Dr. Ostapenko applied for tenure.

On February 9, 2016, Dr. Rachel Petty, Chief Academic Officer, notified him that the University denied his application because he did "not possess an earned doctorate in Marketing from a regionally accredited post-secondary institution."[2] UDC Resolution No. 84-10 requires that candidates "promoted to the academic rank of associate professor or professor must possess the terminal degree from a regionally accredited post-secondary institution as indicated for the academic program." Apparently, the University did not enforce this policy against Dr. Ostapenko when it promoted him to an Associate Professor in 2008.

After the University conveyed its decision on his tenure application, Dr. Petty sent Dr. Ostapenko a "Faculty Re-Appointment Notice – Academic Year 2016-2017," offering him a "one-year appointment" for the upcoming academic year. This letter differed from those that Dr. Ostapenko had received prior to the denial of

---

[2] The record does not provide an explanation for the three-year delay between the time Dr. Ostapenko applied for tenure and the University's decision denying his application.

his tenure application, in that this letter did not describe his employment as a "continuing faculty appointment."[3]  Rather, the letter stated in relevant part:

> Based on the denial of your tenure application, and per DCMR8 citation regarding denial of tenure[1], you are being offered a one-year appointment, covering the period of August 16, 2016 through May 15, 2017.
>
> [1] DCMR8 - 1471.2: "If a faculty member is denied tenure at the end of seven (7) years or more of service, the continuation of that faculty member's employment with the University shall be on the basis of a year to year contract."

Dr. Ostapenko signed the one-year appointment offer on August 1, 2016; the employment period covered August 16, 2016 through May 15, 2017.  He also appealed the denial of his tenure application to University President Ronald Mason, Jr., who denied the appeal on December 9, 2016.  On March 16, 2017, Vice President for Human Resources Patricia Johnson wrote to inform Dr. Ostapenko that his "appointment as a Marketing Professor in the College of Business and Public Administration would expire and [his] employment would be terminated" effective May 15, 2017.

---

[3]  Once the University hired him as an Associate Professor in 2008, Dr. Ostapenko would receive in May or June of each year a "Faculty Re-Appointment Notice," providing him notice of his "continuing faculty appointment" for the upcoming academic year.

## C. Grievance and Arbitration

On January 27, 2017, Dr. Ostapenko filed a Faculty Grievance Form, in which he designated the Faculty Association as his representative.[4] The Form listed the "applicable article(s)" as Article XI ("Disciplinary/Adverse Actions"), Article XIV ("University Tenure"), and Article XVIII ("Compensation"), and included a one paragraph description of the dispute, entitled the "Statement of Grievance," which read as follows:

> The UDC Faculty Association grieves the Administrative Decisions regarding Non-Renewal of Dr. Nikolai Ostapenko, Associate Professor, SBPA, in violation of the Seventh Master Agreement due to the Granting of Dr. Ostapenko a one-year terminal contract and the non-renewal of Dr. Ostapenko for academic year 2017-2018. The issuance of a terminal contract also violates Section 1471.2 of the University's Regulations, which states as follows: "If a faculty member is denied tenure at the end of seven (7) years or more of service; the continuation of the faculty member's employment with the University shall be on the basis of a year to year contract."

The Form was accompanied by a two-page narrative section that outlined the above-identified facts; the narrative was clear that the grievance was not challenging the

---

[4] While the parties' briefs both assert that Dr. Ostapenko filed the grievance, the language of the grievance implies that the Faculty Association filed the grievance on his behalf.

University's denial of Dr. Ostapenko's tenure application, but was limited "to the employment consequences of the denial of [his] tenure application." On March 20, 2017, University President Mason denied the grievance, and the Faculty Association sought arbitration pursuant to the Agreement. The parties designated an arbitrator and set a date for a hearing, which was subsequently cancelled because, prior to its commencement, the University moved to stay arbitration.

### D. Procedural History

On December 13, 2018, the University filed a motion in the Superior Court to stay arbitration, arguing that Dr. Ostapenko's dispute is not arbitrable because (1) while working on a temporary, one-year contract, he was not a member of the bargaining unit, and (2) tenure decisions are not subject to arbitration under the Agreement. On January 17, 2019, the Faculty Association filed a cross-motion to compel arbitration, asserting that Dr. Ostapenko remained a member of the bargaining unit during the 2016-2017 academic year and that his grievance concerned contractual rights governed by the Agreement. By dual orders issued on March 22, 2019, the trial court granted the University's motion and denied the Faculty Association's motion, ruling that Dr. Ostapenko did "not have standing under the Seventh Master Agreement to arbitrate his grievance." The trial court

found that, by accepting a "one-year contract" for the 2016-2017 academic year, Dr. Ostapenko was "demoted . . . to a temporary appointment, thereby excluding him from membership [in] the . . . bargaining unit." It ruled that the University's decision to offer Dr. Ostapenko a one-year contract "was contingent upon the University's denial of his tenure application" and, therefore, the grievance "challenge[s] the University's tenure decision," which is precluded from arbitration under the Agreement. Because parties cannot be compelled to arbitrate disputes that they have not agreed to arbitrate, the trial court ruled that it could not compel arbitration here.[5] This appeal followed.

## II. Legal Framework

We review the issue of arbitrability – "whether the parties agreed to arbitrate a particular type of issue" – de novo. *Jahanbein v. The Ndidi Condo. Unit Owners Ass'n, Inc.*, 85 A.3d 824, 827 (D.C. 2014) (quoting *Certain Underwriters at Lloyd's London v. Ashland, Inc.,* 967 A.2d 166, 173 (D.C. 2009)); *see also AT & T Techs.,*

---

[5] The Faculty Association also requested that, in the event the court granted the University's motion and found the matter not arbitrable, the court convert the Faculty Association's motion into a complaint for breach of contract. The court denied this request without prejudice, finding that the Faculty Association had "provided insufficient grounds for a breach of contract claim at this juncture." Faculty Association has not raised this ruling on appeal, and we do not address it.

*Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) ("'[W]hether or not [a party] was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties.'" (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547 (1964))). Before granting a motion to compel arbitration, a court must find that (1) the parties have an enforceable agreement to arbitrate, and (2) the parties' underlying dispute falls within the scope of that agreement. *Jahanbein*, 85 A.3d at 827; *see also* D.C. Code § 16-4406(b) (2012 Repl.). In determining whether a particular dispute is covered by an arbitration clause, "we 'inquire merely whether the arbitration clause is susceptible of an interpretation that covers the dispute.'" *Parker v. K & L Gates, LLP*, 76 A.3d 859, 867 (D.C. 2013) (quoting *Haynes v. Kuder*, 591 A.2d 1286, 1289 (D.C. 1991)). If there is any ambiguity as to whether a matter is within the scope of an arbitrator's authority, "'any doubts are to be resolved in favor of arbitration.'" *Jahanbein*, 85 A.3d at 827 (quoting *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 922 (D.C. 1992)); *Wash. Teachers' Union, Local No. 6, Am. Fed'n of Teachers, AFL-CIO v. District of Columbia Pub. Sch.*, 77 A.3d 441, 456-57 (D.C. 2013) ("[T]he presumption in favor of arbitration becomes operative only where the court must interpret an ambiguous clause in the agreement."). This "presumption" or "preference for arbitration," however, must be balanced against the principle that arbitration is a matter of contract, and therefore a court must not require a party to

submit to arbitrate any dispute that it has not agreed to do so. *Jahanbein*, 85 A.3d at 827. Thus, if the court has "positive assurance" that the parties did not intend a particular dispute to be resolved through arbitration, "'then the court may not compel arbitration, because to do so would be contrary to the parties' agreement.'" *Id.* (quoting *2200 M Street, LLC v. Mackell*, 940 A.2d 143, 152 (D.C. 2007)).

Because "'the arbitrator's authority derives from the consent of the parties,'" it is the court's responsibility to settle "the basic contractual question" of "'whether the parties are bound by a given arbitration clause.'" *Hossain v. JMU Props., LLC*, 147 A.3d 816, 821 (D.C. 2016) (quoting *Woodland Ltd. P'ship v. Wulff*, 868 A.2d 860, 864 (D.C. 2005)). Once the court settles this basic question, the arbitrator decides "'other "gateway" matters that the parties would likely expect that the arbitrator would decide, including procedural questions which grow out of the dispute and bear on its final disposition.'" *Id.* at 821 (quoting *Wulff*, 868 A.2d at 865). These include whether "prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met." *Wash. Teachers' Union*, 77 A.3d at 446 n.10 (quoting Unif. Arbitration Act (2000) § 6 cmt. 2, 7 U.L.A. (Part 1A) 26 (2009)); *see also* D.C. Code § 16-4406(c) ("An arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled . . . .").

### III. Analysis

The parties do not dispute the existence of a valid arbitration agreement, but rather contest whether Dr. Ostapenko's disputes fall within its scope. Article XI of the Agreement specifies that only "grievances" may be submitted to arbitration, defining a grievance as "a formal written complaint that there has been a violation, misinterpretation, or improper application of the terms and conditions of th[e] Agreement." The Statement of Grievance identified the relevant disputes as (1) the University's decision "[g]ranting . . . Dr. Ostapenko a one-year terminal contract," and (2) its "non-renewal of Dr. Ostapenko for academic year 2017-2018." Therefore, we must determine whether these issues meet the contractual standard of a "violation, misinterpretation, or improper application" of the Agreement such that it falls within the scope of the arbitration agreement. *See Jahanbein*, 85 A.3d at 827 (noting that, to compel arbitration, "a court must find that . . . the underlying dispute between the parties falls within the scope of the agreement" (cleaned up)).[6] We evaluate each in turn.

---

[6] We reject the Faculty Association's argument that the trial court's use of the word "standing" meant that it ruled on a "procedural condition precedent reserved to the arbitrator, not to the courts." While the trial court referenced Dr. Ostapenko's lack of "standing," its analysis centered on whether the substance of the dispute in

### A. The University's Decision to Grant Dr. Ostapenko a Contract Upon the Denial of His Tenure Application

The Faculty Association claims that the University's decision to grant Dr. Ostapenko a contract for the 2016-2017 academic year violated the "year to year contract" requirement of 8-B D.C.M.R. § 1471.2 (2020) ("Status of Faculty Members Denied Tenure"). Section 1471.2 provides, "If a faculty member is denied tenure at the end of seven (7) years or more of service, the continuation of that faculty member's employment with the University shall be on the basis of a year to year contract." The Faculty Association argues that the University violated this regulation, describing the contract Dr. Ostapenko received as "terminal," rather than

the Faculty Grievance Form fell within the scope of the parties' arbitration agreement and whether Dr. Ostapenko was a party to the arbitration agreement with the University. Both questions are questions for the court. *See Wash. Teachers' Union*, 77 A.3d at 446 ("Because 'a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed to submit,' the question of whether a particular dispute is subject to arbitration is reserved for the court to decide.") (quoting *Am. Fed'n of Gov't Emps., Local 3721 v. District of Columbia*, 563 A.2d 361, 362 (D.C.1989)) (brackets in original); *see also Grad v. Wetherholt Galleries*, 660 A.2d 903, 905-07 (D.C. 1995) (holding that arbitrator did not have "exclusive authority to decide who was a party to the agreement containing the arbitration clause," and that the arbitrator's determination was subject to judicial determination without deference). Therefore, we do not construe the trial court's order as reaching any "gateway" matter that would be for the arbitrator to decide, but rather as reaching the question of arbitrability, i.e., whether the Faculty Association's dispute fell within the scope of the Agreement's arbitration provision.

"year to year," because it was not renewed for the 2017-2018 academic year. The Faculty Association argues that this decision is arbitrable. We affirm the trial court's ruling that the University's decision, pursuant to 8-B D.C.M.R. § 1471, to grant Dr. Ostapenko a contract upon the denial of his tenure application constitutes a "tenure decision" as contemplated by the Agreement and, thus, is not arbitrable. The Faculty Association presents two arguments to the contrary, and we conclude that each is without merit.

### i. Whether the Agreement's exclusion of "tenure decisions" from arbitration incorporates 8-B D.C.M.R. § 1471.

The Faculty Association argues that there is "no evidence . . . that the phrase 'tenure decisions'" – as contemplated in Article XIV and, thus, excluded from arbitration – "include[s] the employment consequences of the denial of tenure." The Faculty Association attempts to disentangle the University's decision to deny Dr. Ostapenko's tenure application from its decision to offer him further employment pursuant to 8-B D.C.M.R. § 1471.2. It argues that "there is no contractual linkage between" the two and, thus, the latter decision cannot be a "tenure decision" or "decision regarding tenure" that is precluded from arbitration as expressly provided

in Articles IX, XI, and XIV.[7]  The University counters that "tenure decisions" includes "*all* tenure decisions . . . – not just tenure denials," and thus implies, without directly stating, that a decision made pursuant to 8-B D.C.M.R. § 1471.2 is also excluded from arbitration.

The Agreement does not define the terms "tenure decisions" or "decision(s) regarding tenure."  And while Article XIV is entitled "University Tenure" and recognizes that tenure track faculty may apply for tenure (and that "[t]enure decisions" are excluded from arbitration), it does not identify the criteria for that process or its potential outcomes.  Rather, those topics are covered in the municipal regulations governing the University.  *See* 8-B D.C.M.R. §§ 1460 to 1471 (2020). Section 1460, "University Tenure:  General Policy," states that the "award of University tenure to existing or prospective faculty members shall be based on the procedural and eligibility requirements set forth in §§ 1461 through 1471."  *Id.* § 1460.3.  Although the regulations do not define the terms "tenure decisions" and "decisions regarding tenure," they do identify the criteria for awarding tenure, *id.* § 1462 ("Criteria for Award"), the process by which applicants who are not awarded

---

[7]  *See* Art. IX (B), ¶5 ("Decisions regarding tenure shall not be . . . subject to the grievance and arbitration procedure."); Art. XI(A), ¶3 ("Tenure decisions may not be challenged in the grievance and arbitration procedure."); Art. XIV, ¶3 ("Tenure decisions shall not be subject to the grievance and arbitration procedure . . . .")

tenure may seek review and reconsideration, *id.* § 1470 ("Review and Reconsideration of Tenure Recommendations"), and the status of those whose tenure applications were denied, *id.* § 1471 ("Status of Faculty Members Denied Tenure").

Importantly, the regulations do not identify the potential employment consequences of the denial of tenure, *with one exception.* Section 1471 prescribes the University's conduct as follows:

> 1471.1 Eligible candidates who are denied tenure, except for those who have made early application, may not reapply for tenure.
>
> 1471.2 If a faculty member is denied tenure at the end of seven (7) years or more of service, the continuation of that faculty member's employment with the University shall be on the basis of a year to year contract.

8-B D.C.M.R. § 1471. Thus, pursuant to § 1471.2, in denying the tenure application of a faculty member who has seven or more years of service, the University is required to either: (1) terminate the faculty member's employment, or (2) continue it "on the basis of a year to year contract." *Id.* Among the regulations controlling "the award of University tenure," *id.* § 1460.3, this is the only mandated decision the University is required to make upon the denial of a tenure application. Thus, the logical construction of the District's regulations governing the University

contemplate that the conduct prescribed in § 1471.2 constitutes a part of the tenure decision process. Reading § 1471.2 in the context of the regulatory section in which it is found supports an interpretation that a decision made pursuant to § 1471.2 is a "tenure decision" within the meaning of Article XIV of the Agreement.[8]

The Faculty Association argues the phrase "tenure decision" is ambiguous, thus triggering the presumption of arbitrability. We do not find that the Agreement contains an ambiguous clause that requires us to presume arbitrability. *See Jahanbein*, 85 A.3d at 827; *Wash. Teachers' Union*, 77 A.3d at 456-57. In Articles IX, XI, and XIV, the Agreement contains repeated and express clauses excluding "tenure decisions" from the arbitration procedure, see *supra* note 7, giving us the sort of "positive assurance" that the parties did not intend disputes concerning tenure

---

[8] In this case, it is not our task to determine whether the contract the University awarded to Dr. Ostapenko for the 2016-2017 academic year complied with the "year to year contract" requirement of § 1471.2. Though the Faculty Association argues that the University awarded a "terminal contract" rather than a "year-to-year contract" as authorized by 8-B D.C.M.R. § 1471.2, there is no authority or rationale provided to support this distinction. The Faculty Association states that "[u]nder a 'year-to-year' contract there is always the possibility of renewal based upon the faculty member's performance and University needs," whereas a "terminal contract" "guarantees from the outset there will be no second year." However, appellant does not demonstrate how the contract awarded is distinguishable from a "year-to-year contract." Additionally, we take no position on whether employment decisions other than that prescribed by § 1471.2 that may result from or dovetail with a tenure decision would also be considered "tenure decisions" pursuant to Article XIV and excluded from arbitration.

decisions to be resolved through arbitration. *See Jahanbein*, 85 A.3d at 827. Because we conclude that the conduct prescribed in § 1471.2 is part of the tenure decision process, the employment decision made pursuant to § 1471.2 is also expressly excluded from the arbitration procedure.

### ii. Whether the dispute represents a violation of Article XXX.

Alternatively, the Faculty Association contends that "Article XXX unambiguously requires the University to follow its Regulations on matters not directly covered by the contract"; thus, Dr. Ostapenko's dispute – that the University violated 8-B D.C.M.R. § 1471.2, and thus, Article XXX – "is arbitrable."[9] University argues that Article XXX does not incorporate 8-B D.C.M.R. § 1471.2 because that regulation "deals with *tenure decisions*," and the Agreement "precludes

---

[9] Nowhere does Dr. Ostapenko's Faculty Grievance Form allege that the University's violation of 8-B D.C.M.R. § 1471.2 amounted to a violation of Article XXX. In fact, the Form does not identify Article XXX at all, and references to Article XXX appear only in court filings. Because the Faculty Association did not allege a violation of Article XXX in the grievance, it may be that such a claim was forfeited. *Cf. Dupree v. District of Columbia Dep't of Corrections*, 132 A.3d 150, 157 nn. 32 & 33 (D.C. 2016) (noting that claims not raised before an administrative agency are forfeited). We need not decide that issue, however, because we conclude that the Faculty Association's argument lacks merit.

*tenure decisions* from arbitration."[10]  Article XXX states that all "[m]atters not directly covered by this Agreement shall be governed by applicable D.C. regulations and law."  Whether 8-B D.C.M.R. § 1471.2 is one of the applicable D.C. "regulations" that Article XXX incorporates by reference is a matter of contract interpretation.  *See Jahanbein*, 85 A.3d at 827 ("[A]rbitration is a matter of contract, and we therefore may not require a party to submit to arbitration any dispute which he has not agreed so to submit." (cleaned up)).  As discussed above, § 1471.2 appears within a series of regulations concerning tenure, *see* 8-B D.C.M.R. §§ 1460 to 1471, and "University Tenure" is "directly covered" by Article XIV.  Thus, we conclude that Article XXX does not incorporate 8-B D.C.M.R. § 1471.2.  Therefore, the Faculty Association's dispute concerning the University's violation of 8-B D.C.M.R. § 1471.2 does not allege a violation of Article XXX.

In addressing the legal question of whether faculty members, who have seven or more years of service and whose tenure application the University has denied, may arbitrate the University's decision to continue their employment pursuant to § 1471.2,  we conclude that the University's decision to continue that employment pursuant to § 1471.2 is a "tenure decision" within the meaning of Articles IX, XI,

---

[10]  At first, the University appeared to categorically "den[y] that Article XXX incorporates the . . . regulations [governing the University] into the collective bargaining agreement."

and XIV; is expressly excluded from arbitration by those Articles; and, thus, is not arbitrable. Therefore, the University's decision pursuant to § 1471.2 to offer Dr. Ostapenko a contract for the 2016-2017 academic year – upon the denial of his tenure application – is a "tenure decision," outside the scope of the parties' arbitration agreement, and not arbitrable.

## B. The University's Decision Not to Renew Dr. Ostapenko's Contract for the 2017-2018 Academic Year

The Faculty Association's second dispute pertains to the University's decision not to continue Dr. Ostapenko's employment for the 2017-2018 academic year. It argues that "Article [XI] permits the arbitration of the dismissal of a non-probationary faculty member such as Dr. Ostapenko." In response, the University contends that following the denial of tenure and Dr. Ostpenko's acceptance of the yearly contract for the 2016-2017 academic year he was no longer a member of the bargaining unit, and therefore his dispute is not subject to the terms of the Agreement. We agree with the University.

The Agreement permits arbitration of disputes concerning Article XI ("Disciplinary/Adverse Actions"). The "standards and procedures" of Article XI "shall be the sole and exclusive means by which a disciplinary or adverse action may

be brought against a faculty member covered by this Agreement," defining a "disciplinary or adverse action" to include a "dismissal." However, as argued by the University, we must first resolve the threshold matter as to whether Dr. Ostapenko was a member of the bargaining unit during the 2016-2017 academic year.

Article IV of the Agreement defines members of the unit as being "[a]ll full-time faculty employees holding a permanent appointment from apportioned funds. . . ." In support of its decision that this dispute was not arbitrable, the trial court determined that when Dr. Ostapenko accepted the one-year contract after the denial of tenure he was demoted to a temporary appointment. Thus, excluding him from the bargaining unit because he no longer held a "permanent appointment from appropriated funds". We agree with the trial court's conclusion that, after Dr. Ostapenko was denied tenure and accepted a one-year contract, he no longer held a permanent appointment and therefore was no longer a member of the bargaining unit.

Subtitle 8-B of the District of Columbia Municipal Regulations houses the rules and regulations embodying the principles of merit and equal employment governing the University's employees, to include appointments. 8-B D.C.M.R. § 1 *et seq.* (2021); *see also* D.C. Code § 1-608.01a(b)(1). All "Educational Service"

employees of the University are created by the D.C. Comprehensive Merit Personnel Act of 1978 ("CMPA"), except those explicitly excluded from 8-B D.C.M.R. § 1100.1 (2021); D.C. Law 2-139, Title VIIIA, § 801A(a).  However, professors are not excluded and are therefore Educational Service employees.  8-B D.C.M.R. § 1100.1(a)-(f).  In relevant part, Section 1103.1 of Subtitle 8-B of the D.C.M.R. provides that "[e]ach appointment to the . . . Educational Service shall be classified as," (c) Regular; . . . or (f) Temporary.  A regular appointment is "an appointment made to fill a position on a permanent basis."  8-B D.C.M.R § 1199.1 (2021).  A temporary appointment is "an appointment that is limited to, and does not exceed, three hundred and sixty-four (364) days."  *Id.*; *see also* 8-B D.C.M.R. § 1111.1 (2021) ("An employee shall be deemed 'temporary' when his or her appointment does not exceed three hundred sixty-four (364) days").

Following his tenure denial, on August 1, 2016, Dr. Ostapenko accepted the University's one-year appointment for an employment period covering August 16, 2016 through May 15, 2017.  The employment period was significantly less than three hundred sixty-four days; thus, Dr. Ostapenko was a temporary employee for the 2016-2017 academic year.

When the parties to the Agreement intended its coverage to extend to former members of the bargaining unit, they did so by express provision in the Agreement. For example, Article XXI of the Agreement expressly extends contract rights to former bargaining unit members who seek reinstatement after the University has terminated them as part of a reduction in force. The ability of these former employees to file grievances does not, as the Faculty Association argues, turn merely on whether they were *former* members of the bargaining unit, but rather on whether the Agreement expressly extends them contract rights after they leave the bargaining unit.[11] However, it is evident that Dr. Ostapenko does not fall into a broader class because he was appointed as temporary employee following his tenure denial. In sum, Dr. Ostapenko was not a member of the bargaining unit during the 2016-2017 academic year because he accepted a temporary appointment after the denial of

---

[11] The Faculty Association argues that terminated faculty can grieve their discharges (as being without requisite cause, a violation of the Agreement) merely because they are *former* members of the bargaining unit. We disagree. They can grieve their discharges because they were members of the bargaining unit at the time the University allegedly violated their rights under the Agreement (and rectifying the violation would entitle them to reinstatement). In contrast, Dr. Ostapenko was no longer a member of the bargaining unit when the University allegedly violated his rights by not renewing his one-year contract.

tenure; therefore, he is precluded from alleging a "grievance" pursuant to Article XI of the Agreement.[12]

## IV. Conclusion

We hold that the University's employment decision made pursuant to 8-B D.C.M.R. § 1471.2 constitutes a "tenure decision" that is expressly excluded from arbitration by Articles IX, XI, and XIV of the Agreement. Therefore, the University's decision, upon the denial of Dr. Ostapenko's tenure application, to provide him a contract for the 2016-2017 academic year pursuant to § 1471.2 is not arbitrable, and we affirm the trial court's ruling that this dispute is not subject to arbitration. We also conclude that the University's decision not to renew Dr. Ostapenko's contract for the 2017-2018 academic year is not arbitrable as a "grievance" because Dr. Ostapenko was not a member of the bargaining unit after accepting a temporary appointment following the denial of tenure. As to this dispute, we affirm the trial court's rulings to grant the University's motion to stay arbitration and deny the Faculty Association's motion to compel arbitration.

---

[12] The Faculty Grievance Form identifies Article XVIII ("Compensation") as an "applicable article," however, the parties do not argue, and we cannot discern, how these disputes implicate Article XVIII. Therefore, we do not address it.

*So ordered.*